[Civ. No. 11006. First Appellate District, Division Two.—March 7, 1939.]

In the Matter of the Estate of JOSEPH F. VELLADAO, Deceased. MARIA VELLADAO de FRAGA et al., Appellants, v. LILLIAN LOUISE NIEMEIER et al., Respondents.

S. Joseph Theisen and Arthur J. Harzfeld for Appellants.

B. H. Dean, Jr., and Donahue, Richards & Hamlin for Respondents.

STURTEVANT, J.—After the will of the decedent had been admitted to probate two nieces of the decedent filed a contest based on the allegations that the decedent was incompetent when he made his will and that it was obtained by the exercise of undue influence. Lillian L. Niemeier and Maria Motta, legatees named in the will, appeared and answered. The contest was heard before the trial court sitting with a jury. After the contestants had presented their case the trial court granted the motion of the proponents for a

nonsuit. From the minute order entered thereon the contestants have appealed.

From the briefs of contestants we gather the following facts. The decedent died July 8, 1935, aged eighty-five years. He had never married, and had no occupation. His next of kin and sole heirs at law were his widowed sister, Mary Velladao Avelar, aged eighty-nine, and his four nieces, Mary Sheldon and Maria Motta, and contestants, Maria Velladao de Fraga and Evelyn Gertrude Lawrence, incompetent. He left an estate appraised at $35,771.39. Arbitrarily deducting, for debts, expenses of last illness and funeral, executor's, administrator's and attorney's fees, and expenses of administration, $5,771.39, leaves, for simplicity of calculation, an estimated net estate of $30,000.

The contested will was dated April 13, 1935, less than three months prior to his death, at a time when he was very weak, had been suffering for many years from heart trouble, diabetes, kidney and bladder trouble, asthma, rheumatism and other ailments, from which he was then very thin, gone away to almost nothing, could hardly speak, had a glassy stare in his eye, too sick to get shaved, and too far gone to be interested in letters. The chief beneficiary was respondent Mrs. Niemeier, who had been his trusted housekeeper and with whom he had been living alone at his home at 1794 Hazel Avenue, Hayward.

In addition to the bequests to Mrs. Niemeier, there were, in May or June, 1935, after the date of the purported will and within two months prior to his death, placed in joint tenancy with her, decedent's 1095 shares of Transamerica Corporation, valued by contestants at $12 per share.

Decedent and his relatives were Portuguese. From Portugal he and his sister and brothers had gone to the Azores, from whence he and one of his brothers had gone to Gold Hill or Virginia City, working in the mines, after which the decedent came to California. He had no occupation. He used to send money all the time to his aged sister while she was in the Azores. In 1920 he sent for her and had her brought to his home at Hayward. She remained there three weeks, after which she went elsewhere to live. She did not understand the English language. Having brought her here from a foreign country, he was by federal laws required to obligate himself to support her in order to prevent her from

becoming a charge upon the public. He faithfully carried out this natural and legal obligation. He sent her money every month, and brought her chickens, fruit, and all the things he used to have about his place, as much as he could spare. He visited her and she visited him from time to time. He always treated her very well and assured her that he would always take care of her.

With his other relatives he got along equally well. He visited his niece Mary Sheldon at Los Gatos once every year for several days at a time and frequently at San Francisco. She visited him at Hayward every two or three months, at times with her sister Evelyn Lawrence. She was fond of him, felt very close to him, and regarded him very highly since he had given her every reason to do so. He was a kindly old gentleman. When she visited him she seldom went away empty handed. Decedent's relations with his sister and nieces were thus shown to have been affectionate and cordial.

Mrs. Niemeier was first introduced to the decedent in 1910 or 1911 by his nurse, a friend of hers, and she took care of him in his illness for about five years on and off. In 1917, at the request of her friend, she went to work for decedent at his home at 1794 Hazel Avenue, Hayward, and he and she continued to reside there until his death. From 1912 he was ill and weak, and he continued ill and weak until the time of his death, gradually becoming worse. During this entire period he was very weak, was suffering from heart trouble, diabetes, kidney trouble, bladder trouble, asthma, rheumatism, and other ailments. These diseases continued from a time prior to Mrs. Niemeier's employment in 1917 until his death, getting worse and worse, and he became weaker and weaker. On April 10, 1935, three days before the date of the will, he was so ill that he could hardly speak, hardly above a whisper. His respiration was very bad, he was very thin, and had gone away to almost nothing. He had a very glassy stare in his eye, his facial expression was like a dying man, he had a long beard, yet was too ill to get shaved, too sick, too far gone to be interested in letters, and even too ill to state whether he had a doctor. The doctor had given him up, had said that he was dying and that complications would set in any minute and he was gone. As further evidence of his incompetency contestants introduced evidence that insanity existed in the family, his niece, Evelyn Lawrence, having been adjudged incompetent.

The relations between the decedent and Mrs. Niemeier had soon grown to the extent that during these years she had confidence in him and he had confidence in her. They trusted each other implicitly. The contestants say the evidence shows acts of Mrs. Niemeier in keeping decedent's relatives away from him. They point out that his aged widowed sister did not continue to live with him after he had brought her from the Azores. In 1934, the year before he died, decedent told his niece Mary Sheldon that "Mrs. Niemeier nagged and bossed him so much that he darn near threw her out recently." On April 10, 1935, three days before the date of the will, when his niece Mrs. Sheldon went to visit him. Mrs. Niemeier appeared at the door and said that she could not go in, but she walked by notwithstanding. She found her uncle propped up with blankets and pillows, and she asked Mrs. Niemeier "if I might be alone with him a minute and she shook her head and remained in the room". Mrs. Niemeier went outside with Mrs. Sheldon when she left the room. The latter asked Mrs. Niemeier to let her know when he passed away, but never heard from her. "Once before she would not let me see him alone."

In their brief the proponents state that "the appellants have combed the record with meticulous care and have extracted therefrom and set out in their brief every shred of evidence" bearing upon the issue of competency. In the reply brief the contestants concede that summary to be a correct statement. As to the competency of the decedent, Mrs. Niemeier and Mrs. Sheldon were the only witnesses examined on the subject. Neither of those witnesses testified to any facts proving or tending to prove that the deceased was not mentally competent the day he executed the will that is under attack, or at any other time. Therefore, in so far as the issue of competency is concerned, the nonsuit was properly granted. (*Estate of Fraser,* 177 Cal. 266 [170 Pac. 601].)

Passing to the contention that the will was the result of undue influence exercised on the volition of the decedent, the evidence was equally weak. There was not a particle of evidence that Mrs. Niemeier ever asked the decedent to make a will, nor to name her as a beneficiary if he did make one, nor that anyone else did any of these things acting in her behalf. The uncontradicted evidence regarding the execution

of the will was as follows. A short time before the will was executed the decedent asked Miss Noack to tell Mr. W. T. Knightly, an officer of decedent's bank, to call, as decedent wanted to make a will. Later, Mr. Knightly called and brought with him Lester Foley, an attorney at law. Those two men entered the room and had a talk with decedent. No one else was present. Later they left and thereafter Mr. Foley and Miss Elaine Enos, his secretary, called bringing with them the will. They entered the room where the decedent was and transacted their business. No one was present excepting those three. After the will had been signed by the decedent, Mr. Foley and Miss Enos signed as witnesses. Mrs. Niemeier did not know a will had been written until after the death of the decedent. On the trial the contestants did not call as witnesses Mr. Knightly, Mr. Foley, Miss Enos, or Miss Noack. In the case entitled *Estate of Bryson,* 101 Cal. 521 [217 Pac. 525], the court was considering a will contest. In that case, as in this case, at the end of the presentation of the testimony by the contestants the trial court granted a motion for a nonsuit. In that case, as in this case, it was claimed that one of the beneficiaries stood in a confidential relation to the decedent. On page 541, Mr. Justice Seawell, speaking for the court, said: "It may be stated that so far as opportunity is concerned, any one of the heirs of the testatrix had equal opportunity to visit with, consult, and advise with testatrix. We entertain no doubt that Isaac H. Bryson advised with his mother fully on both business and personal matters and on subjects affecting the present and future welfare of the family. This was not only his privilege but his duty. Unpleasant as well as pleasant matters were no doubt the subject of consideration. Proof to establish undue influence must be had of a pressure which overpowered the mind and bore down the volition of the testator *at the very time the will was made.* (*Estate of Carithers,* 156 Cal. 422 [105 Pac. 127].) It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment. (*Estate of Kilborn,* 162 Cal. 4, 11 [120 Pac. 762].)'' (Em-

phasis ours.) Applying those rules to the instant case it is obvious that the record was wholly insufficient and that the trial court properly granted a nonsuit on the issue of undue influence.

The contestants seek to excuse this deficiency by stressing two separate facts. They claim Mrs. Niemeier stood in a confidential relation to the decedent and that it may be presumed she exercised an undue influence. The proponents concede at once that a confidential relation existed, however they assert there is no evidence that she was active in procuring the execution of the will or that she participated therein to any extent. That is a sound distinction. (*Estate of Shay,* 196 Cal. 355, 364 [237 Pac. 1079].)

The other contention made by the contestants is that the will was most unnatural. They stress the fact that the decedent sent to the Azores and requested his sister Maria V. Avelar to come to California and that he promised to help her. Those facts are not disputed, nor is it claimed the decedent did not keep his promise. However, by the terms of the will he bequeathed to his sister $500, whereas he bequeathed to Mrs. Niemeier several thousand dollars. Again it is not disputed that Mrs. Avelar was eighty-nine years of age; that from about the time she arrived in California she went to live with her daughter and was living with that daughter at the time of the trial. The decedent had been in the habit of giving his sister $5 a month and a legacy of $500 would provide for the continuation of those payments probably as long as the sister might survive. Moreover, Mrs. Niemeier had served most efficiently as nurse and housekeeper for eighteen years on a nominal wage of $20 per month. Bearing these facts in mind this court may not say the will was an unjust will. In *Estate of Shay, supra,* at page 364, the court said: "Whether or not the will is unjust is a matter of opinion, as to which we have no right to substitute the opinions of the jurors or the members of this court for that of a testator." The contention of the contestants is, in effect, to infer that the will was unnatural; that the will being unnatural it may be inferred undue influence was exercised; and that as Mrs. Niemeier was a beneficiary under the will it may then be inferred that she exercised the undue influence. Such reasoning may not be based on the facts adduced in the record before us. (Code Civ. Proc., sec.

1958.) It therefore follows that on the issue of undue influence the evidence was wholly insufficient and the trial court did not err in granting the motion for a nonsuit as to that issue.

In the next place the contestants complain that the motion for a nonsuit did not express the precise grounds therefor and the motion should have been denied. (9 Cal. Jur. 548.) The vice in that contention is that the rule relied on is applicable when a motion is *denied* but it has no application where the motion is *granted*. In the latter instance the ruling will be sustained if it was properly granted upon any ground whether it was specified in the motion or otherwise. (*Anchester* v. *Keck*, 214 Cal. 207, 214 [4 Pac. (2d) 934].)

Finally the contestants set forth several rulings made by the trial court excluding certain evidence. We have examined each one and do not hesitate to state that each separate ruling has our entire approval. No one of the rulings presented a debatable question of law.

The order appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.