[Civ. No. 12025.   First Dist., Div. One.   Nov. 7, 1942.]

BERTHA WILSON, Appellant, v. ERNEST WILSON, Respondent.

John B. Ehlen for Appellant.

Crist & Beene for Respondent.

PETERS, P. J.—In September of 1938 Ernest Wilson sued his wife, Bertha Wilson, for divorce on the ground of desertion. In November, 1938, Bertha Wilson filed an answer and cross-complaint through attorney Coolidge of San Jose in which she asked for a divorce from Ernest Wilson on the ground of cruelty. After several postponements of the date of trial, all secured by plaintiff herein, the case was set for trial on September 8, 1939. On that date, Bertha Wilson did not appear in person or by counsel and her default was entered. Ernest Wilson was granted a divorce, and the community property divided by awarding Bertha Wilson the home of the parties, which was subject to a mortgage, all household furniture, furnishings and equipment, a 1933 Plymouth automobile, and for life $50 a month cash, and $30 a month

credit at a restaurant operated by Ernest Wilson. Before judgment was entered, Bertha Wilson, through her then counsel, discussed her default with the trial judge who gave counsel a period of time to make a showing why judgment should not be entered. No such showing having been made, judgment was entered. Thereafter, Bertha Wilson moved to set aside the judgment under section 473 of the Code of Civil Procedure, which motion, after a modification favorable to appellant, was denied. No appeal was taken from the interlocutory decree, and an abortive appeal was taken by appellant's then counsel from the order denying the motion under section 473 of the Code of Civil Procedure. A short time after the denial of the motion, Bertha Wilson instituted the present action in equity to set aside the interlocutory decree upon the ground that her absence from the trial and her failure to secure the presence of counsel was caused by her unavoidable illness. The trial court entered a judgment of nonsuit, from which Bertha Wilson appeals.

This being an appeal from a judgment of nonsuit, under elementary principles, all conflicts in the evidence must be resolved in favor of appellant. Keeping that rule in mind, the record shows the following:

The appellant and respondent have been married thirty-seven years, but separated at least twelve years prior to the date the divorce action was filed. After appellant filed her cross-complaint in December of 1938, the case was set for trial for February 21, 1939. On that date, at the request of appellant's then counsel, Mr. Coolidge, the trial was continued to March 30th. Thereafter, further continuances were secured on March 30th, April 13th and May 23rd. The last three continuances were secured without prior notice to the respondent on the oral motion of Duncan Oneal, one of appellant's then attorneys, the motions being supported by letters from Dr. Blake Wilbur, each stating that appellant's health was such that it would be dangerous for her to appear for trial. No attempt was made during this period or at any time thereafter by appellant's then counsel to take appellant's deposition.

On May 23, 1939, Duncan Oneal withdrew from the case and the trial was continued to September 8, 1939. Appellant was notified by letter from Oneal of the continuance, and the letter further informed appellant that in Oneal's opinion "it would be in his opinion most difficult to obtain any further continuance." On July 6, 1939, there was served

upon appellant notice that the time of trial had been set for September 8, 1939, and a demand that she appoint another attorney. The critical question on the present appeal is whether appellant, between July 6th and September 8th, exercised reasonable care in her various attempts to secure a lawyer to represent her.

The record is somewhat vague as to dates, but it is apparent that immediately after July 6th appellant did make some attempt to get a lawyer. She called on a San Francisco municipal judge for advice as to how to protect her rights. The judge sent her to a San Francisco attorney who refused to take the case but recommended attorney Jensen of San Jose. She called at the office of Jensen, and he was out. All this was done the first week after July 6th. Thereafter, according to appellant's testimony, she was confined to her bed for two weeks. That would bring the time to the end of July. Apparently nothing was done at all by appellant during the entire month of August. About September 6, 1939, she again became active. She called at the offices of John McNab in San Francisco, but found he was out of town. On September 6th, she sought the advice of Bishop Karl Block of San Francisco who recommended that she consult the law firm of McCutchen, Olney, Mannon and Greene. Bishop Block made an appointment for her to see Mr. Greene of that office. Mr. Greene was unable to represent her and asked attorney John Parker of the same firm to handle the case. Parker conferred with Mrs. Wilson and then told her he could not handle the case, but recommended attorney John G. Eliot of San Francisco. Mrs. Wilson then went to the office of Eliot. According to his testimony, he told her he could not appear for her on September 8th, inasmuch as he was to be out of town, but thought a continuance could be secured if Dr. Wilbur would again write to the judge. Eliot testified that Mrs. Wilson told him of her condition of health and that attorney Coolidge had represented her. He telephoned to Coolidge, and the latter informed Eliot that he had declined to further represent Mrs. Wilson. Eliot further stated that he told Mrs. Wilson that he did not care to represent her because the case was pending in San Jose, but that he would do all he could, short of appearing for her, to have the trial postponed. He also testified that Mrs. Wilson told him of the prior continuances secured upon letters from Dr. Wilbur, but there is no evidence that she told Eliot of the letter she had received from

Oneal indicating that further continuances would be difficult to secure. Eliot thereupon telephoned Dr. Wilbur in Palo Alto, and the doctor told him he would be glad to again examine Mrs. Wilson, and, if her health had not improved, would write to Judge James as he had on prior occasions. Eliot arranged for Mrs. Wilson to be examined by Dr. Wilbur on September 7th.

Late in the afternoon of September 7th Mrs. Wilson was examined by Dr. Wilbur. He testified that he then found she was still suffering from coronary heart disease, arteriosclerosis and hypertension; that, in his opinion, it would have been dangerous for her to appear in court. He thereupon wrote a letter to Judge James, addressed to the Court House in San Jose, which reads as follows:

"Dear Judge James:

"I believe the divorce case of Mrs. Ernest Wilson is to come before you tomorrow morning. I wrote you several months ago that she was too ill to appear in Court, and I have examined her again today. She has made a great deal of improvement but I still believe that it would be definitely dangerous for her to appear in Court at the present time. She might easily suffer a coronary occlusion, which could be fatal. This is my own opinion and also that of my brother who is a practicing physician in San Francisco and who has been consulted by Mrs. Wilson.

"If possible, I believe this case should be put off for a few months more."

Mrs. Wilson testified that Eliot told her he would represent her at the trial, and that she was not to worry because she would be represented. She further testified that Dr. Wilbur told her she would be represented; that the case would be continued; that she left his office with the assurance that the case would be continued. Both Eliot and Dr. Wilbur failed to corroborate Mrs. Wilson in these particulars, in fact, the evidence of Eliot contradicts that of Mrs. Wilson in several material respects.

It was stipulated that Dr. Wilbur sent the letter above quoted to Judge James, special delivery, and that the letter was placed in the mail slot of Judge James' chambers at 6:53 a. m., September 8, 1939. Whether Judge James received the letter does not appear. Prior to September 8, 1939, the case had been transferred to the department presided over by Judge Syer. It is admitted that Judge Syer did

not see the letter. When the case was called, there being no appearance by appellant, her default was entered.

It is, of course, apparent that respondent was in no way to blame for the nonappearance of appellant. The case in no way involves fraud, extrinsic or intrinsic, or mistake, on the part of respondent. It is the theory of appellant that by reason of her illness and reliance upon the belief that a continuance would be granted there was a mistake on her part sufficient to authorize a court of equity to set the judgment aside. ▮ It is well settled that equity will relieve an injured party from the effect of a judgment procured by extrinsic fraud, mistake or excusable neglect which was not the result of negligence or laches on the part of the complainant. (*Anglo California Trust Co.* v. *Kelley,* 117 Cal.App. 692 [4 P.2d 604] ; *Sohler* v. *Sohler,* 135 Cal. 323 [67 P. 282, 87 Am.St.Rep. 98] ; *Bacon* v. *Bacon,* 150 Cal. 477 [89 P. 317] ; *Simonton* v. *Los Angeles T. & S. Bank,* 192 Cal. 651 [221 P. 368] ; *Clavey* v. *Loney,* 80 Cal.App. 20 [251 P. 232] ; *Jeffords* v. *Young,* 98 Cal.App. 400 [277°P. 163].) In the recent case of *Olivera* v. *Grace,* 19 Cal.2d 570, 575 [122 P.2d 564], the Supreme Court stated the rule as follows, quoting from 5 Pomeroy, Equity Jurisprudence (Equitable Remedies [2d ed.]), pages 4671, 4672: ''. . . where the legal judgment was obtained or entered through fraud, mistake, or accident, or where the defendant in the action, having a valid legal defense on the merits, was prevented in any manner from maintaining it by fraud, mistake, or accident, and there had been no negligence, laches, or other fault on his part, or on the part of his agents, then a court of equity will interfere at his suit, and restrain proceedings on the judgment which cannot be conscientiously enforced . . . The ground for the exercise of this jurisdiction is that there has been no fair adversary trial at law.''

▮ Such an action is a direct attack on the judgment (*Hammell* v. *Britton,* 19 Cal.2d 72 [119 P.2d 333]·; *Campbell-Kawannanakoa* v. *Campbell,* 152 Cal. 201 [92 P. 184] ; *Caldwell* v. *Taylor,* 218 Cal. 471 [23 P.2d 758, 88 A.L.R. 1194] ; *Walsh* v. *Majors,* 4 Cal.2d 384 [49 P.2d 598]), and the fact that the complainant applied for and was denied relief under section 473 of the Code of Civil Procedure is not a bar to equitable relief. The two remedies are distinct, and cumulative. (*Anglo California Trust Co.* v. *Kelley, supra; Bacon* v. *Bacon, supra; Jeffords* v. *Young, supra; Lake* v. *Bonynge,* 161 Cal. 120 [118 P. 535] ; *Carp* v. *Superior Court,* 76 Cal.

App. 481 [245 P. 459]; *Nielsen* v. *Emerson,* 119 Cal.App. 214 [6 P.2d 281]; *Baker* v. *Baker,* 217 Cal. 216 [18 P.2d 61]; *Sontag* v. *Denio,* 23 Cal.App.2d 319 [73 P.2d 248].) ▮ Equity will not overturn a judgment unless it appears that a like judgment would not follow. It is incumbent upon the complainant to plead and prove that the result in the main action would have been different had the fraud or mistake not occurred. (*Miller* v. *Ambassador Park Syndicate,* 121 Cal.App. 92 [9 P.2d 267]; *Riddle* v. *Baker,* 13 Cal. 295; *Gregory* v. *Ford,* 14 Cal. 138 [73 Am.Dec. 639]; *Preston* v. *Hill,* 38 Cal. 686; *Allen* v. *Currey,* 41 Cal. 318; *Harnish* v. *Bramer,* 71 Cal. 155 [11 P. 888]; *Richardson* v. *Loupe,* 80 Cal. 490 [22 P. 227]; *Collins* v. *Scott,* 100 Cal. 446 [34 P. 1085]; *Eldred* v. *White,* 102 Cal. 600 [36 P. 944]; *Heim* v. *Butin,* 109 Cal. 500 [42 P. 138, 50 Am.St.Rep. 54]; *Parsons* v. *Weis,* 144 Cal. 410 [77 P. 1007]; *Eisenmayer* v. *Thompson,* 186 Cal. 538 [199 P. 798].) ▮ It is also fundamental that equity will not grant such relief unless the complainant was without fault. If the complainant was guilty of negligence in permitting the fraud to be practiced or the mistake to occur equity will deny relief. (*Bancroft* v. *Bancroft,* 178 Cal. 359 [173 P. 579, L.R.A. 1918F, 1029]; *Fonner* v. *Martens,* 186 Cal. 623 [200 P. 405]; *Hendricks* v. *Hendricks,* 216 Cal. 321 [14 P.2d 83]; *Borland* v. *Thornton,* 12 Cal. 440; *Quinn* v. *Wetherbee,* 41 Cal. 247; *Rudy* v. *Slotwinsky,* 73 Cal.App. 459 [238 P. 783].)

▮ Applying these fundamental principles to the facts of the present case, we have no hesitancy in holding that the trial court properly granted the nonsuit. ▮ It is not every "mistake" that will justify equity in setting aside a final judgment. Thus, a final decree of distribution will not be set aside where it cuts off an heir of the testator who was not known to the executor or administrator or heirs even though the complainant through no fault of his own had no knowledge of the death of his ancestor. (*Lynch* v. *Rooney,* 112 Cal. 279 [44 P. 565]; *Mulcahey* v. *Dow,* 131 Cal. 73 [63 P. 158]; *Beltran* v. *Hynes,* 40 Cal.App. 177 [180 P. 540]; *Hewett* v. *Linstead,* 49 Cal.App.2d 607 [122 P.2d 352].) In *Bacon* v. *Bacon, supra,* which is the leading case on mistake as a ground for relief from a final judgment, the court intimated that for mistake to be a ground for relief it must be a mistake induced by the other party to the action. In *Thayer* v. *Fish,* 49 Cal.App.2d 618 [122 P.2d 358], it was held

that where no duty of trust exists, and where the judgment is entered as much by the fault of one party as the other, equity is powerless to grant relief.

Appellant places her main reliance on the case of *Jeffords* v. *Young, supra*. That was an action in equity to set aside a final judgment in a quiet title action. The complaint alleged that the quiet title action was set for trial on October 25, 1923, in a county other than that in which complainants lived; that on October 23d attorney Randall, complainants' local counsel in the county of the place of trial, telephoned to complainants and told them that it would not be necessary to appear for trial; that (p. 403) "said cause was to be continued, by stipulation of counsel . . . and that he had arranged . . . for the filing of an amended complaint therein"; that, as a result, complainants did not attend the trial; that attorney Randall on the day of trial was very ill and died a few days thereafter. The trial court sustained demurrers to this complaint, and judgment was entered for defendants. That judgment was reversed by the appellate court. At page 404 it was held: "The serious illness of complainant's counsel which prevents an appearance at the trial or a fair presentation of his cause, and which situation by the exercise of due diligence could not have been anticipated or avoided, may warrant the intervention of equity." At page 405 the rule is stated as follows: "Ordinarily a client is chargeable with the negligence of his own attorney. [Citing cases.] But manifestly, when, without the knowledge or fault of a client, his attorney becomes physically or mentally incapacitated so that his acts or conduct which are controlled thereby leads to a damaging result in pending litigation so detrimental and unjust as to shock the conscience, surely equity will furnish relief." Appellant urges that the rule of that case is applicable here. It seems quite clear to us that the factual and legal situations involved in that case differ fundamentally from those here presented. In the Jeffords case neither the complainant nor her attorney was guilty of negligence. The mistake which prevented an adversary trial of the quiet title action occurred through no fault of complainant. But that is not so in the present case. The record shows that in May, 1939, Oneal withdrew from appellant's case. Sometime before July 6, 1939, Coolidge wrote appellant that he had withdrawn from her case. Shortly thereafter, early in July, 1939, respondent's attorneys served notice on appellant personally that "C. C. Coolidge, Esquire, and Duncan Oneal, Esquire,

heretofore your attorneys, having withdrawn and ceased to act as your attorneys, plaintiff and cross-defendant hereby demands that you appoint another attorney, or that you appear in person, in the above-entitled action." On August 15, 1939, Coolidge again notified appellant that he could no longer represent her and that she would have to get other counsel. Appellant, therefore, had more than two months to secure other counsel. She testified that she was sick in bed for two weeks in July, and that she was quite active for a period of about a week in that month trying to secure another attorney. She did nothing to secure an attorney during the entire month of August. She did nothing at all until September 6th. As to what happened on September 6th and 7th, the evidence presents a conflict. According to appellant's testimony, Eliot told her that he would represent her at the trial and not to worry, that she would be represented; whereas, according to Eliot's testimony, his service to appellant was purely an accommodation for the purpose of arranging through Dr. Wilbur to postpone the trial, and that he told appellant he would not and could not represent her but that he would do everything he could, short of appearing for her, to secure a postponement. The evidence is susceptible of but two possible interpretations: Assuming that appellant's testimony is true, Eliot was neglectful in failing to have someone present on September 8th to request the continuance, or in not communicating with the judge. On the other hand, assuming that Eliot's testimony is true, appellant was negligent. She had no reasonable basis for believing that a letter from Dr. Wilbur, with no one present to present it, would secure the continuance. On every prior occasion when a continuance had been secured, an attorney had presented the motion. Attorney Oneal had informed her immediately after May 23d that "it would be in his opinion most difficult to obtain any further continuance." Certainly, even though a layman and inexperienced in court procedure, she had no lawful right to rely on any statement made by Dr. Wilbur that the case would be continued. If final judgments may be set aside because of reliance on advice secured by a litigant from a layman, there would be no finality at all in a final judgment. There can be no escape from the conclusion that, under the evidence, complainant or her counsel were guilty of inexcusable neglect. For that reason the case is not governed by the rule of the Jeffords case.

The factual and legal situation presented in the instant case is substantially similar to that involved in *Wattson* v. *Dillon*, 6 Cal.2d 33 [56 P.2d 220]. That, too, was an action to vacate a final judgment. The trial court vacated the judgment but on appeal that determination was reversed. The facts there involved were as follows: R. A. Wattson was under contract with the city of Los Angeles to construct certain street improvements. He sublet a portion of the work to the Hollywood Granite Company, who, in turn, sublet a portion of the work to the Lewis Construction Company. The latter company negligently performed a portion of the work resulting in injury to the property of the Dillons. The Dillons sued Wattson, the Hollywood Granite Company and the Lewis Construction Company. Wattson was served on October 8, 1930. He immediately telephoned the agent of the bonding company for the Hollywood Granite Company and told that agent that his company was looking to it to take care of the suit. The agent advised that the complaint and summons should be sent to him and promised that his company "would take care of it." Wattson sent the complaint and summons to the bonding company, and in his letter of transmittal reviewed the telephone conversation, and concluded (p. 36): "Please be advised that we loqk entirely to you for protection in this matter." On October 15, 1930, the bonding company acknowledged receipt of the complaint, summons and letter of transmittal and further informed Wattson that the matter had been turned over to their claims department, and that the problem had been taken up with the Union Indemnity Company, the bonding company for Lewis Construction Company, and that (p. 37) "the latter company will handle this matter." About a week or ten days after October 8, 1930, Wattson talked with Lewis of the Lewis Construction Company and was informed by him (p. 37) "that the matter had been handled satisfactorily." On October 21, 1930, Lewis informed Wattson that the matter had been attended to and there was nothing further for Wattson to do. As a result, Wattson paid no further attention to the action, made no appearance therein, and, as a result, his default was taken in December, 1930. Judgment against Wattson was entered in May of 1931 and a writ of execution levied in December of 1931. Upon the levy of the execution, Wattson, for the first time, learned that no appearance had been made on his behalf and immediately instituted the present action to set the judgment aside. The

decree in his favor was reversed, the court holding that under the facts he was guilty of inexcusable neglect. In this connection the court stated (p. 37): "We are of the view that plaintiffs Wattson from the first did not give the attention to the suit filed against them which ordinarily prudent business men would give to a matter of serious concern." This conclusion was reached, as a matter of law, although the trial court found that, prior to the action by the Dillons, Wattson had referred all claims arising out of the performance of the contract to the bonding company and all such claims had been satisfactorily adjusted. The court emphasized that there was no negligence or fraud on the part of the Dillons. It was recognized that mistake alone, under the proper circumstances, will warrant equitable relief, but it was held that that power is limited to situations where the mistake is not the result of the complainant's negligence. In this connection, the court stated (p. 40): "The only mistake which the evidence indicated was present was that respondents believed that some appearance in the action . . . would be made in their behalf. It must, however, be conceded that this mistake of itself would not warrant the very broad relief which they sought in the form of a decree vacating a solemn judgment duly rendered upon evidence submitted to the court. Upon respondents rested the further burden of showing that the mistake was not due to their own negligence. . . ."

At page 42 the court stated: "In conclusion we may add that there is no claim made that the defendants are in any way responsible for plaintiffs' default. No collusion or fraud is chargeable to defendants. The facts seem to present a clear case of negligence on the part of plaintiffs to give proper attention to a matter which the law exacts of every person upon whom legal service is made. The failure of plaintiffs to appear in the action was not occasioned by a mistake of law or by mistaking one thing for another or by misrepresentation. It was a case of neglecting to do a necessary act."

The principle laid down in the above entitled case is conclusive in the instant case. If the facts of the Wattson case justified the court in reversing a plaintiff's judgment on the ground that negligence as a matter of law existed, the trial court was justified in the present case in granting a nonsuit. We see no escape from the conclusion that the facts of the present case demonstrate that complainant was either guilty of negligence herself, or is chargeable with the neglect of her attorney.

It should be noted that the judgment sought to be set aside is not such as to shock the conscience. It is quite apparent that on the default hearing, and on the hearing of the motion under section 473 of the Code of Civil Procedure, the trial judge carefully considered the extent of the community property of the parties and made an equitable division. In the present trial the court inquired extensively into the property rights of the parties. That evidence demonstrates that the award made to the complainant was fair and equitable.

In a brief filed after the oral argument appellant urges that the judgment must be reversed for the reason that respondent failed to specify the grounds of the motion for nonsuit with the particularity required. Since the decision of *Anchester* v. *Keck,* 214 Cal. 207 [4 P.2d 934], it has been the rule in this state that a ruling granting a motion for nonsuit will be sustained if it was properly granted on any ground, whether such ground was specified in the motion or not. (See, also, *Hanrahan-Wilcox Corp.* v. *Jenison M. Co.,* 23 Cal.App.2d 642 [73 P.2d 1241] ; *Estate of Velladao,* 31 Cal.App.2d 355 [88 P.2d 187].)

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied December 7, 1942, and appellant's petition for a hearing by the Supreme Court was denied December 31, 1942.