[Civ. No. 11596. Second Appellate District, Division One.—June 3, 1938.]

In the Matter of the Estate of CLARA NORTHWAY BURNS, Deceased. ALVAN M. DODGE et al., Appellants, v. IVAN A. BOLTON et al., Respondents.

Lee T. Mullen, Claude A. Shutt, Zach Lamar Cobb and Earl A. Littlejohns for Appellants.

Hewlings Mumper, Clifford E. Hughes, Baldwin Robertson and Hervey & Hervey for Respondents.

WHITE, J.—Certain of the heirs of Clara Northway Burns, deceased, contested her will after probate, and they appeal from a judgment against them following the granting of proponents' motion for nonsuit.

By her will, dated September 13, 1934, Clara Northway Burns sought to dispose of an estate valued at approximately a half million dollars. Under the terms of her will, decedent bequeathed the sum of $7,500 in $1500 bequests to each of five friends. With the exception of a diamond ring and pin given to second cousins, her jewelry and other personal ef-

fects were bequeathed to friends, as were her home and the furnishings therein, which went to Ivan A. Bolton, a young lawyer friend of the decedent, who had resided in her home for some two years. All of her remaining property, of every kind and character, was devised and bequeathed to Edwin A. Meserve and Shirley E. Meserve and the survivor of them, in trust, without bond from either, with the direction that one-quarter of the net income should be paid in monthly instalments to Hugh Nawn during his natural life and the other three-fourths of the net income from said trust to be paid each year to Ivan A. Bolton during his natural life in monthly instalments. The will then directed that in the event Hugh Nawn or Ivan A. Bolton should die, then the entire net income from the trust should be paid to the survivor, and upon the said survivor's death the trust should terminate and $1,000 therefrom should be paid to the British Old People's Home, a charitable institution, while all the rest and residue of the trust estate should be paid to the Hollenbeck Home, a charitable institution. Then followed paragraph nine of the will, reading as follows:

"If any of my property be undisposed of by the foregoing will by reason of any construction of the will, or because any provision thereof is contrary to law, or through any legacy or trust provision lapsing, or from any other cause, then I devise and bequeath such otherwise undisposed of property to Edwin A. Meserve."

By the terms of the will, Edwin A. Meserve was appointed executor without bond, with the added provision that in the event of his death, refusal to act, or resignation, his son, Shirley E. Meserve, should be the sole executor, without bond.

In *Estate of Lances*, 216 Cal. 397, 400 [14 Pac. (2d) 768], so often referred to with reference to the power of the court to grant a nonsuit, we find the following language: "A nonsuit or a directed verdict may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." (Citing cases.) The expression, "disregarding conflicting evidence", obvi-

ously means to disregard only the fact that there is a conflict in the evidence and give full credit only to that portion of the evidence, whether produced by plaintiff or defendant, which tends to support the allegations contained in plaintiff's complaint.

The record discloses the following:

Petitioners in this will contest were first cousins of the decedent. With the exception of petitioner Lillie L. Dodge, there had been no communication between petitioners and the decedent over a long period of years. In the case of petitioner Lillie L. Dodge there were admitted in evidence two letters addressed by the decedent to Lillie L. Dodge under date of April 6, 1932, and March 16, 1933, both of which bore the salutation, "Dear Lillie," the first being signed, "Lovingly, Clara," while the second concluded with the words, "Love, Clara." Defendant and respondent Edwin A. Meserve is and for many years had been a licensed and practicing attorney in Los Angeles; he first met the decedent, Clara Burns, about thirty or forty years ago, at which time she was the wife of John Johnston; following their first meeting they became good friends, and he acted as her attorney until the time of her death, at which time she was of the age of seventy years. It also appears that Mr. Meserve acted as Mr. Johnston's attorney and upon his death probated his will. Some time following Johnston's death, decedent married James P. Burns, who died during January, 1928, and Mr. Meserve and his associates also acted as attorneys for the decedent in probating Mr. Burns' will. It was testified by a physician that he treated decedent professionally from August to October, 1927, when she suffered from an affliction commonly known as shingles, a disease which primarily involves the nerves just outside of their origin in the spinal cord; that while he was treating decedent in 1927 she suffered from a severe physical illness and "most of the time she was in a mentally confused condition, didn't know where she was". The evidence then discloses that some months after this illness, and about one month after the death of her husband, Mr. Burns, and during the course of the probate proceedings involving the latter's will, Mr. Meserve drew decedent's will, dated February 10, 1928, in which the clause making Mr. Meserve residuary legatee was originally incorporated. The decedent made four subsequent wills, respec-

tively in 1930, 1932, 1933, and the final will, now before us, on September 13, 1934. She also executed a codicil to her will during March, 1934. Each of said wills brought forward the clause of the 1928 will making Mr. Meserve residuary legatee. With reference to said clause, the only evidence is that elicited from Mr. Meserve under section 2055 of the Code of Civil Procedure, and this disclosed that Mr. Meserve advised the decedent that ''if and when that will was probated it should be determined that more than the statutory permitted value was going to charity, that on a distribution her heirs could contest that disposition. I explained to her the theory of precatory trusts, told her that she ought to select some person in whom she had—that she knew to whom she would explain everything that she wanted, but must be very careful not to exact from that party any promise that they would do anything or that they would carry out her wishes, leaving it to the conscience alone of that party to do with that property as he or she saw fit. I also stated to her that if there were such a provision in the will that then in all probability no one would contest the proceedings for distribution claiming there was a disposition to charity over and above that allowed by law for the reason that if they contested it and contested it successfully, it would pass to that party and not to the contestant. I had drawn the will with a complete line left blank, and I said, 'Take this will and think it all out and then when you have selected the party to whom you want that to go write that name in with your own handwriting.' She later brought that will in with my name written in her own handwriting on the one line that was left blank for that purpose . . . I had suggested to her two different names, Mr. E. S. Pauly, vice president of the First National Bank, and Mr. Jay Spence, the then vice president of the bank on Sixth and Spring Streets, as being the parties who were very intimate business friends of hers as well as socially. I had told her that I didn't want her to select my own name at that time, calling her attention to the fact that she had previously stated that she wanted to leave me the larger part of her estate, and I told her that that could not be done; that I would not permit it. Then with that explanation she executed the will of 1928.''

With reference to the execution of the last will, the only evidence pertaining thereto indicates that Mr. Edwin A. Meserve was not present when the decedent signed it; that Mr. Meserve was engaged in connection with some litigation in Pomona; that while he was so engaged, decedent came to see him, saying, ''I want to make a number of changes in my will'', to which Mr. Meserve replied, ''That is all right, Clara, you have been doing that right along.'' Mr. Meserve testified then as follows: ''I said, 'I haven't time to take this down and I want you to take this copy and write it out in your own handwriting. I am going to copy that, whatever changes you make on this will. You are competent to make them, and you write it out in your own handwriting, you bring it in and Miss Phillips (one of Mr. Meserve's secretaries) will copy it. She will then, if I am not here, will then submit it to someone, some lawyer in the office, who will go over it to see that the things that you have changed have been properly incorporated in your new will, and then will supervise the execution of the will.' She said, 'Well, if you are not here to supervise the execution of that will—I would be more—I want Shirley (an attorney, and son of Edwin A. Meserve) to do it.' ''

With reference to the execution of the last-named will, the only evidence in the record indicates that decedent came to the office of Mr. Meserve, who was absent therefrom, whereupon the decedent consulted the above-mentioned Mr. Shirley E. Meserve, and the will was thereupon executed, with Mr. Shirley E. Meserve and the legal secretary, Miss A. Phillips, acting as witnesses thereto.

With reference to the relationship existing between the decedent and the defendant and respondent Ivan A. Bolton, it appears that the latter was introduced to the decedent by a friend in 1932, and the following year Mr. Bolton went to live at the home of decedent. With reference to decedent's attitude toward Mr. Bolton, Mr. Edwin A. Meserve testified, ''She told me that Mr. Bolton was a lawyer, had been admitted to practice law; that he was down and out, and she thought that if she helped him get an office and start him as a lawyer that he would put his feet on the ground and probably succeed. She told me that he seemed never to have quite gotten his feet on the ground after he was gassed in the war and that she thought that if she helped him that

he would succeed as a lawyer. . . . Some time after that Mrs. Burns in speaking of Bolton said that he had been to her more like a son than any person that she had ever known; that he had treated her with great respect; that he had gone on trips with her and Mr. and Mrs. Bannister, and with her and Mrs.—I can't think of her name for the moment— Kroening, gone on trips and had always helped her, had taken charge of seeing that the rooms were provided and that things were done, and she said that he had been to her a very helpful son and she was very much in hopes that he was going to make a go of it.''

There was also testimony in the record that before Bolton came to live at the home of decedent, the latter had many friends visiting her and entertained frequently, but that Bolton objected to her friends' coming, and that thereafter such visits became more infrequent. The record also contains testimony to the effect that during November, 1934, an argument ensued between Bolton and the decedent pertaining to a Christmas celebration to which the decedent had been in the habit of inviting many of her friends, and that Bolton said to the decedent, ''No, we won't have that party. I am not going to have all those old hens around me at Christmas. If we are going to have a party, I am going to give out the invitations.'' It was also in evidence that Bolton had received from the decedent some $11,000 during the two-year period from January, 1933, to December, 1934. There was also testimony to the effect that Bolton frequently complained to the decedent that he was crippled by arthritis and could hardly walk, and he would walk in a crippled manner when in the presence of decedent, but would walk all right when he was out of her presence.

Further testimony was to the effect that during her lifetime and particularly about October, 1934, decedent complained of the treatment accorded her by Bolton; that upon an occasion when Mrs. Burns expressed a desire to go down and talk with Attorney Meserve about her will, Mr. Bolton suggested that someone else could do it, but that the decedent insisted she wanted Mr. Meserve. Another witness testified to statements on the part of Mr. Bolton in which he expressed a desire to obtain the house in which decedent was living, and that he was continually talking about decedent dying. A nurse who attended the decedent during her last illness,

from December 5, 1934, until her death on January 7, testified that the decedent asked the nurse to get in touch with Attorney Meserve because decedent wanted ''to rectify the mistake that she had made to her relatives in the east''. The witness testified that in compliance with this request she went downstairs to use the telephone, but Bolton was using the telephone and told her, ''If there is any phoning to be done at this time, I am the boss around here, and the one who will do it.''

With this statement of the evidence as contained in the record, we proceed to a discussion of appellants' claim that the evidence they produced established a *prima facie* case of undue influence in the making of decedent's will, by reason of which the trial court fell into error in granting a nonsuit thereon.

Reviewing the question of the sufficiency of the evidence to sustain the judgment of nonsuit in the light of settled and established legal principles, we are confronted first of all with the fact that every person of sound mind over the age of eighteen years may dispose of his separate property by will. (Prob. Code, sec. 20.) As was said in an especially well-considered opinion prepared by Mr. Presiding Justice Nourse of Division Two of the First Appellate District in the *Matter of the Estate of Nolan*, 25 Cal. App. (2d) 738 [78 Pac. (2d) 456], ''the property of the testator is his to dispose of as he wills, and he is not called upon to consult or satisfy the wishes or views of juries or courts (*Estate of Spencer*, 96 Cal. 448, 452 [31 Pac. 453] ; *Estate of Perkins*, 195 Cal. 699, 709 [235 Pac. 45] ) ; and 'whether in the minds of others a will is just or unjust is a matter of opinion, and to permit a jury to determine the question without that substantial evidence which the law requires would be to permit a jury to make the disposition irrespective of the desires of a testator.' (*Estate of Donovan*, 114 Cal. App. 228, 233 [299 Pac. 816].)'' .

Appellants' first claim, that the will was executed under the undue influence of respondent Attorney Edwin A. Meserve, is without any merit whatever. The authorities in this state are numerous to the effect that however unnatural a will may appear to be, and however much at variance with expressions by the testator as to his intentions with regard to relatives or the natural objects of his bounty, it

may not be held invalid on the ground of undue influence unless there be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution. (See *Estate of Clark,* 170 Cal. 418, 424 [149 Pac. 828] ; *Estate of Carithers,* 156 Cal. 422, 428 [105 Pac. 127] ; *Estate of Gleason,* 164 Cal. 756, 765 [130 Pac. 872] ; *Estate of Lavinburg,* 161 Cal. 536 [119 Pac. 915].)

▇ This is the settled general rule. There is a well-established exception to this rule, upon which the contestants rely here, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud. As suggested in *Estate of Higgins,* 156 Cal. 257, 261 [104 Pac. 6], a "presumption of undue influence" arises from proof of the existence of a confidential relation between the testator and such a beneficiary, *"coupled with activity on the part of the latter in the preparation of the will".* However, the confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will. See, in this connection, *Estate of Ricks,* 160 Cal. 450 [117 Pac. 532] ; *Estate of Lavinburg,* 161 Cal. 536, 543 [119 Pac. 915] ; *Estate of Higgins, supra; Estate of McDevitt,* 95 Cal. 17, 33 [30 Pac. 101] ; *Coghill* v. *Kennedy,* 119 Ala. 641 [24 So. 459]. ▇ The whole claim of contestants in this connection is that there was such activity on the part of respondents Edwin A. Meserve and Ivan A. Bolton, but there is no evidence in the record to support this contention. As to respondent Edwin A. Meserve, there is not even a scintilla of such evidence. In fact, the testimony points clearly to the absence of any such activity on Mr. Meserve's part. True, some of this evidence was elicited under section 2055 of the Code of Civil Procedure, and contestants were entitled to rely only upon that portion of such evidence as was favorable to their claim and were not bound by any adverse testimony given by witnesses called under that section. But nevertheless, such testimony remained in the record and was uncontradicted.

We may assume for the purposes of this decision that there was a sufficient *prima facie* showing to satisfy the law

of the existence of a confidential relation between the decedent and her attorney Edwin A. Meserve, as well as between the decedent and Ivan A. Bolton, in connection with the latter of whom the evidence indicates there was a relationship characterized by the testatrix as that of foster-mother and foster-son; and we may assume that Attorney Meserve did participate in procuring the execution of the original and subsequent wills down to the one before us; but the record is absolutely destitute of any evidence of such activity on the part of Attorney Meserve in connection with the execution of the last will which was offered for probate. [5] As to respondent Bolton, much, if not all of his conduct and activity against which complaint is lodged occurred months after the execution of the will here in question. There is nothing in the record before us inconsistent with the idea that the testatrix executed the will here in controversy without any previous suggestion of such action by anyone, and entirely of her own free will, without influence or coercion of any kind. The burden was on the contestants to show the contrary, and it is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but before a will can be overthrown, the circumstances must be inconsistent with voluntary action on the part of the testatrix. (*Estate of Morcel*, 162 Cal. 188 [121 Pac. 733]; *Estate of Donovan*, 114 Cal. App. 228 [299 Pac. 816]. See, also, *Estate of Presho*, 196 Cal. 639 [238 Pac. 944], and *Estate of McDevitt, supra.*) The evidence in this case, when weighed by the standard here enunciated, falls far short of showing any such undue influence as in effect destroyed the testatrix' free agency and overwhelmed her volition at the time of making the will with which we are here concerned.

In asserting that respondent Edwin A. Meserve profited unduly under the terms of the will, appellants lay particular stress upon their claim that the charitable devises and bequests violated the provisions of sections 41 and 43 of the Probate Code, and that therefore the estate in excess of that which may legally be given to charitable institutions would go to respondent Meserve. Without indulging in mathematical computations, it is sufficient to say that the statute against charitable devises and bequests can be violated only when the devise or bequest takes effect, and at that time is shown to be illegal for excess (*Estate of Camp-*

*bell,* 175 Cal. 345 [165 Pac. 931]) ; and the fact that the attempted charitable bequests may in the future be ascertained to be excessive under the statute is not sufficient to warrant a present conclusion upon our part that they are excessive and therefore invalid, and that consequently the residuary legatee succeeds to a portion thereof.

 Conceding as appellants do in their brief, that the sole question involved on this appeal is whether the evidence produced by them established a *prima facie* case of undue influence in the making of decedent's will, it follows from what we have said that a verdict in favor of contestants could not have been held to have sufficient support in the evidence, and that the trial court did not err in granting the motion for a nonsuit.

Judgment affirmed.

York, P. J., and Doran, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 1, 1938.