[Civ. No. 7388.  Third Dist.  Sept. 8, 1947.]

Estate of OLIVE WATKINS, Deceased.  CORA KINSER et al., Appellants, v. ED WATKINS et al., Respondents.

Fred M. Bollinger and J. Calvert Snyder for Appellants.

Thomas E. Reynolds for Respondents.

ADAMS, P. J.—Olive Watkins died testate on May 28, 1945, at the age of 92, leaving an estate alleged in the petition for probate of her will to consist of a 100-acre farm estimated to be worth $7,500, 25 shares of California Western States Life Insurance Company valued at $900, and cash in three different banks amounting to $11,900. By the terms

of her will the farm was devised to Sidney and Ed Watkins, the sons of her deceased husband by a former marriage, aged respectively 60 and 59 years. The stock and cash, after payment of debts, expenses of administration, etc., were bequeathed in equal shares to her three daughters, to wit: Mrs. Cora Kinser, aged 68 years, Mrs. Ella Monroe, aged 73 years, and Mrs. Laura Kinser, aged 71. The two stepsons were designated as residuary legatees, and Ed Watkins was named as executor.

Prior to the admission of the will to probate, Cora Kinser, Laura Kinser and Ella Monroe filed contests, the latter, an incompetent, appearing by her guardian, James E. Kinser, son of Laura Kinser. Grounds of contest asserted were that the testatrix was not of sound mind and was incompetent to make a will; that the will was the result of undue influence exerted over the decedent by Ed and Sidney Watkins; and that the will was not duly executed. The proponents of the will, the Watkins brothers, denied the foregoing allegations of the complaint of contest.

Trial of the proceedings was had on December 6 and 7, 1945, and resulted in a judgment in favor of the proponents and an order admitting the will to probate. Findings were filed in which it was recited that at the time said will was executed Olive Watkins was of sound and disposing mind and memory; that she was not acting under fraud, menace, duress or undue influence of any persons whomsoever; that she was in every respect competent by said last will to dispose of her estate; and that the will was executed, published and declared by her, in every respect as required by law. A motion for a new trial was denied, and from the judgment that followed and the order admitting the will to probate, as well as from the order denying a new trial, contestants have prosecuted this appeal, contending, as grounds for reversal, that the evidence produced is insufficient to support the trial court's findings regarding undue influence and competency, and that the trial court erred in certain rulings upon the admission of evidence. No contention is here made that the will was not duly executed.

Certain facts developed during the trial, which are not controverted, show that Olive Watkins married E. G. Watkins, the father of proponents, in 1900. Mr. and Mrs. Watkins and the two Watkins boys thereafter resided upon the

farm property, which is in part in controversy here, until Mr. Watkins died in January, 1921. Upon his death the farm, which consisted of some 300 acres, was left to his widow and his two sons in equal shares; and by the exchange of deeds Mrs. Watkins became the owner of the 100 acres upon which the home stood. Mrs. Watkins and the son Ed continued to live there during the remainder of Olive Watkins' life, and Sidney made his home there most of the time. The two sons managed the farm and divided the proceeds therefrom with their stepmother. The evidence does not show that the daughters of Olive Watkins ever lived on this farm. All were adults at the time their mother was married in 1900, all of them married, and the record indicates that they maintained homes of their own.

For several years prior to Olive Watkins' death she suffered to some extent from the natural results of her advanced age; and for about five years prior to her decease a Mrs. Wood was employed in her home, performed the duties of housekeeper and took general care of the aging woman. After the death of the decedent Mrs. Wood married Ed Watkins.

Other evidence, which, though in some respects conflicting, but which on this appeal must be viewed in the light most favorable to the prevailing parties, shows that shortly before the will of Olive Watkins was executed—which was about one year and three months before her death—she suggested to the Watkins brothers that perhaps she should make her will, and at that time told Ed to get Mr. Reynolds, an attorney, who had previously acted as attorney for both of them, to come out to the ranch. When Mr. Reynolds came he asked her how she wanted the will drawn, and she explained it to him as set forth, talking without any difficulty. The Watkins brothers were present, but there is no evidence that either one of them made any suggestion regarding the terms of the will, or influenced her in any way. Thereafter Mr. Reynolds brought the will to the house, read it to Mrs. Watkins and asked her if it was satisfactory, to which she replied that it was. She also read the will herself, signed it, and then asked Mrs. Wood and a neighbor to sign it as witnesses, which they did. In the meantime, Mr. Reynolds had departed, and thereafter Ed Watkins took the will to him at his office and left it with him.

It is the contention of appellants that at the time this will was executed the testatrix was so debilitated that she

did not know what she was doing, that she was unable to do any business or understand or know the nature of her property or who were the natural objects of her bounty; that she was nearly blind, and suffering from arteriosclerosis to the extent that she was demented; that she was unduly influenced by her stepsons with whom a confidential relationship existed, and that they unduly profited by the will.

However, the testimony of Ed Watkins shows that for about eight months after the will was signed, decedent was able to and did sign checks, that though she sometimes used a magnifying glass for reading she was still able to read, that he and his brother consulted with her about her business affairs, that she could move about without assistance until not long before her death, that as late as 1944, she was able to get out of the house, getting in kindling, etc., that she could go to the bathroom unassisted, that her health was very good for a woman of her age, and that she could hear, though they had to talk to her "a little bit loud." Some 27 checks signed by decedent just prior to and after the execution of the will were introduced in evidence, one or two having been signed on that very day the will was signed, and another as late as June 6, 1944. Sidney Watkins gave testimony regarding the signing of the will, stated that decedent signed it while seated at a table in the kitchen; that she used an eyeglass; that she asked Mrs. Wood and Mr. Becker to sign as witnesses, which they did; that in 1942 and 1943, her health and her mental condition were very good, that she got out of the house from time to time, though she was not spry; that she could wait upon herself; and that in January, February, March and April, 1944, he saw and talked to her every day, her physical condition was good, and her mental condition all right; that later in the year she had to have a cane to get about.

Mrs. Wood (then Mrs. Ed Watkins) testified that until shortly before Mrs. Watkins was taken to the hospital where she died, she had been able to take care of herself, except at times of illness; that she sometimes had dizzy spells, but of short duration; that her mental state never got so bad that she did not know what she was doing; that she knew everything she was doing and saying; that she usually got up late and sat in her chair, but could get up by herself; that in January, February and March of 1944, she signed

the checks paid to Mrs. Wood for her services. Regarding the execution of the will she testified that Mrs. Watkins signed it while sitting in her chair at the table in the kitchen; that Mr. Reynolds brought the will out and read it to her; that she read it over herself with the use of her magnifying glass, signed it and gave it to the witnesses for them to sign, saying it was her will; that no one helped her sign.

Carl Becker, a neighbor who also witnessed the will, testified that he had known Mrs. Watkins as long as he could remember; that Mr. Reynolds brought the will and read it to her, and she said "That's the way I want it"; that she read it through a magnifying glass and signed it unassisted, while sitting at the dining table, in the presence of both subscribing witnesses; that she asked him to sign it, and declared it to be her will; that he did not observe anything wrong with her mental condition. He also testified that he was in the Watkins home nearly every day, that he had seen her sign checks, using the magnifying glass; that he always talked with her when he went there; that she called him Carl and he called her "Grandma."

Morris Carden, who had known Mrs. Watkins since 1934, testified that he had had business dealings with her every year, and saw her in the yard with Ed Watkins and Mrs. Wood in 1944; that about July of that year he called about dinner time and exchanged greetings with her; that he asked her about her health and she said it was about as usual; that during the beet season in October or November, 1943, he saw her at different times out in the yard where the chickens were feeding; that she was a little old lady, stoop shouldered, but that he did not not recognize any difference in her physical condition.

Contestants rely on testimony showing that the testatrix was sick at times, that during periods of illness she was unable to take care of herself unassisted, that she had dizzy spells, that on occasions Ed Watkins had to cut her meat for her, that she wouldn't take a bath, and when asked to do so would get nervous and shaky; that at times she could not wait on herself, that she suffered from arteriosclerosis, that at times she did not know her daughters or their sons.

But the testimony of contestants' witnesses was based upon visits to the Watkins home at intervals and upon the condition of decedent at times of illness. As is too often the case on appeals to this court, contestants set forth in their briefs

only the evidence which is favorable to their contentions. But the veracity of their witnesses, the weight to be given to their testimony and the resolution of conflicts in the evidence were for the trial court; and we cannot say that there was not ample evidence to sustain its findings that at the time the will was executed the testatrix was of sound mind and not the subject of undue influence.

On this appeal appellants rely upon two propositions, that the evidence establishes that there was a confidential relationship between the Watkins brothers and the decedent, and that they unduly profited by the will; that for these reasons the burden of showing that they did not unduly influence the testatrix in the making of her will shifted to proponents, and that they did not meet that burden.

That there was a confidential relationship between the decedent and her two stepsons may be admitted; but that the will was unnatural we cannot concede. Appellants' argument that it is unnatural is based solely upon the fact that decedent left the farm to her stepsons instead of to her daughters. Under the circumstances of this case we think that such disposition was entirely natural and reasonable. The mere fact that the stepsons were not blood relations of Mrs. Watkins is not controlling. In *Estate of Morcel,* 162 Cal. 188, 195 [121 P. 733], where the testatrix executed a will in favor of a man to whom she was not married but with whom she had lived for 20 years in amity and accord, to the exclusion of a daughter, the court said that in view of the circumstances there was nothing unnatural or unreasonable about the will. In *Estate of Nolan,* 25 Cal.App.2d 738, 741 [78 P.2d 456], in which case decedent devised his estate to a cousin to the exclusion of nieces and nephews who contested, the giving of an instruction to the jury that in the absence of evidence explaining the testamentary disposition of decedent's estate his will was to be considered unnatural if, to the exclusion of natural objects of his bounty, it left property to persons who would receive nothing in case he died intestate, was held to be reversible error.

In *Estate of Smith,* 200 Cal. 152, 160 [252 P. 325], the court said regarding a will in which the decedent left his property to a friend to the exclusion of his wife from whom he was estranged, that the evidence tended to stamp the will as fair and just where it was shown that decedent and proponent had been intimate friends for many years, that dece-

dent had been solicitous of proponent's well-being and had lent him money, and where proponent had cared for decedent in his last illness.

In *Estate of Fleming*, 199 Cal. 750 [251 P. 637], where the beneficiary of decedent's will was a stranger to the blood, and testator's mother contested, the court said that the will was not unnatural as the devisee was the daughter of close friends, and the evidence furnished a reasonable explanation of the testamentary act. In *Estate of Arnold*, 16 Cal.2d 573, 588 [107 P.2d 25], where the testator left the bulk of his estate to friends who had been kind to him, and gave his nephew, the contestant, but $1,000, the court said that the will was "perfectly natural."

Such may well be said in this case of the devise of the farm to decedent's stepsons. The property had come to decedent from her husband, and was his separate property. It was a part of the original farm of 300 acres which was the home of Mr. and Mrs. Watkins and the two stepsons who were lads about 14 and 15 years of age at the time decedent married their father; and the house itself was on the 100 acres which, by exchange of deeds between Mrs. Watkins and her stepsons after the father's death, had been conveyed to her. Mrs. Watkins had continued to live on the farm, and the two stepsons successfully managed the property for her, called her "Mother" and took good care of her until her death. There is not even a suggestion that they ever failed in their scrupulous care of her and her affairs, and the relationship between them was apparently as close as it could have been had they been the natural sons of testatrix. To have willed this property away from them would have been to dispossess them of the home where they were born and had lived practically all their lives. On the other hand, the daughters of decedent were all married, or had been, and had families of their own, the evidence showing that Laura had at least one son, contestant herein as guardian of Ella Monroe, and that Cora Kinser had four sons, two of whom were witnesses in the case. While the evidence does not indicate any unfriendliness between decedent and her daughters, it does show that they did not take upon themselves the care of their mother in her declining years; and though they visited her occasionally, Laura Kinser testified she did not see her mother from November, 1943, until

she died. They were all adults when their mother married Mr. Watkins, and for all the evidence shows, never thereafter made their home with her. At the time of her death they were advanced in years and would have been incapable of managing the farm as such. We think the foregoing disposes of appellants' contention that decedent's will was in any respect unnatural or that proponents unduly profited thereby.

On this appeal appellants have apparently abandoned the charge in their complaint of contest that decedent was incompetent since they make no argument in support of same. At any event, the evidence as above set forth fully supports the findings of the trial court that decedent was competent. As for their contention that the will was the result of undue influence by the stepsons or either of them, the matter of the unnaturalness of the will being eliminated, that the testatrix was unduly influenced must find support, if it has any, on the fact that there was a confidential relationship between testatrix and her stepsons. However, such relationship alone is insufficient to support a conclusion that a will is the result of undue influence.

In *Estate of Hull,* 63 Cal.App.2d 135 [146 P.2d 242] (hearing in Supreme Court denied), where decedent, a woman about 78 years of age, left the bulk of her estate to a friend to the exclusion of a sister, and it was contended that the will was the result of undue influence on the part of proponent, and where the existence of a confidential relationship was conceded, and the court said there was evidence sufficient to support an inference that such relationship afforded an opportunity to control the testamentary act, it was said, nevertheless, that such opportunity, coupled with a motive, did not sustain a finding of undue influence in the absence of testimony showing that there was pressure operating directly upon the testamentary act. The court said, page 142:

"Before there is imposed upon the proponent of a will the obligation of presenting evidence of volition, and before the question as to undue influence becomes one of fact for determination by a jury or the court sitting without a jury, there must be evidence, the probative force of which establishes (1) the relations between the one charged with exercising the undue influence and the decedent, affording the former an opportunity to control the testamentary act; (2) that the decedent's condition was such as to permit of a

subversion of her freedom of will; (3) that there was activity on the part of the person charged with exercising undue influence and (4) that such person unduly profited as beneficiary under the will. (*Estate of Graves, supra* [202 Cal. 258 (259 P. 935)]; *Estate of Hampton, supra* [39 Cal.App. 2d 488 (103 P.2d 611)].) And a presumption against the validity of the will is not created by the existence of any one of the circumstances just narrated, standing alone. It is only when a combination of all these circumstances is present in the evidence that their probative force is sufficient to justify the denial of a nonsuit, and place upon the proponent of a will the burden of submitting evidence that the testamentary document was executed free from the taint of undue influence."

It also said, pages 143-144:

"The burden was on the contestants to show undue influence, and in meeting that obligation it is not sufficient for them merely to show circumstances consistent with the exercise of undue influence, but before a duly and solemnly executed will can be invalidated, circumstances must be shown that are inconsistent with freedom of action on the part of the testatrix. (*Estate of Burns, supra* [26 Cal.App.2d 741 (80 P.2d 77)].)"

In the case before us, as we have eliminated the element of undue profit by proponents, under the foregoing decisions the conclusion of the trial court finds adequate support.

Also, we think that the evidence fails to show that proponents actively participated in the procuring and execution of the will. If they can be said to have participated at all, it was only passively. The evidence relied upon by appellants to show that proponents were active in this respect is that Ed Watkins called Mr. Reynolds in to draw the will, and that both brothers were present when he interviewed the testatrix and when she executed the will, that Ed Watkins took possession of the will after its execution, and that he paid Mr. Reynolds for preparing it. These circumstances are plainly insufficent to compel a conclusion that proponents influenced the testatrix to make the will or as to its terms. At most it shows that they had an opportunity to influence her. But, as was said in *Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614], "proof of mere opportunity to influence the mind of the testatrix, even though coupled with

an interest or with a motive to do so, is insufficient. In order to warrant setting aside a will on this ground there must be substantial proof, direct or circumstantial, of a pressure which overpowers the volition of the testator and operates directly upon the testamentary act''; also that mere suspicion that undue influence *may* have been used is not sufficient to warrant the setting aside of a will on that ground; citing *Estate of Morcel, supra.*

Innumerable other cases might be cited holding that the existence of a confidential relationship alone is not enough; that to justify a conclusion that a will was the result of undue influence it must be shown that there was activity on the part of the beneficiary in the matter of the preparation of the will, and that circumstances such as are relied upon here as constituting activity on the part of a beneficiary are not enough to justify a conclusion that the will was the result of undue influence, especially where a trial court has found to the contrary. See *Estate of Shay,* 196 Cal. 355, 362 [237 P. 1079]; *Estate of Fleming,* 199 Cal. 750, 756 [251 P. 637]; *Estate of Morcel, supra; Estate of Burns,* 26 Cal.App. 2d 741 [80 P.2d 77]; *Estate of Ross,* 117 Cal.App. 574, 577 [4 P.2d 164]; *Estate of Jacobs,* 24 Cal.App.2d 649, 652-653 [76 P.2d 128]; *Estate of Knight,* 9 Cal.App.2d 454 [50 P.2d 475]; *Estate of Muller,* 14 Cal.App.2d 129 [57 P.2d 994]; *Estate of King,* 63 Cal.App.2d 365 [146 P.2d 952]; *Estate of Garvey,* 38 Cal.App.2d 449, 462 [101 P.2d 551]; *Estate of Velladao,* 31 Cal.App.2d 355 [88 P.2d 187].

Appellants in their brief assert that as the death certificate recited that Mrs. Watkins died of arteriosclerosis with which she had been afflicted for ten years, the trial court should have taken judicial notice that arteriosclerosis is ''commonly known as senile dementia,'' a progressive, incurable form of insanity. They also urge that we should do so. We have no knowledge, either judicial or otherwise, that arteriosclerosis and senile dementia are the same thing. We are referred to no testimony or medical authority so stating. The former means no more than hardening of the arteries, with which many persons past middle age are afflicted without loss of mental capacity. Senile dementia is defined as severe mental deterioration occurring in the aged, with brain atrophy and loss of memory, etc.; but not all aged persons have senile dementia; and the evidence in this case does not show that

the testatrix suffered from same or from brain atrophy, loss of memory, etc.

Appellants also complain that proponents did not call as witnesses Mr. Reynolds, the attorney who drafted the will, and Dr. Cooper who had been decedent's doctor, and that the conclusion from that fact must be that, had they been called, their testimony would have been adverse to proponents. If any such conclusion follows, it was a matter for the trial court's consideration and not for this court. As Mr. Reynolds was in court at the trial representing proponents, it seems improbable that his testimony would have been adverse to his clients; and at any event, both he and Dr. Cooper were available to contestants had they seen fit to secure their testimony.

Also, appellants complain that the trial court erred in not permitting them to go back more than five years prior to the date of the execution of the will "in producing evidence that would show state of mind of the testatrix, a confidential relationship between the Watkins brothers and testatrix and undue influence on their part." However, reference to the record shows that the question asked upon which the court limited the testimony was the question addressed to Ed Watkins as to how long he, his brother and decedent had operated her property in equal shares. Appellants made no offer to prove anything which was excluded by the court's statement, which was that he did not think they were entitled to go back as far as they were attempting to do; and we cannot say that, had they been permitted to go further, they would have shown anything pertinent regarding the state of mind of the testatrix, or a confidential relationship, or undue influence.

Appellants further argue that the trial court erred in refusing to permit them to call Mrs. Wood (then Mrs. Ed Watkins) as an adverse witness under section 2055 of the Code of Civil Procedure, saying she had a "pecuniary interest accruing" to her under the will. Appellants admit they have no authority for their contention; and section 2055 by its own language excluded her. She was not an adverse party nor one for whose immediate benefit such action was prosecuted or defended. She had no pecuniary interest as the wife of Ed Watkins, for whatever he took under the will would be his separate property. (Civ. Code, § 163.)

Error is also premised upon the refusal of the trial court to permit appellants "to prove the extent and nature of the property of the testatrix and the value left to each of the devisees in the will." We can find in the record no attempt to prove those matters, nor anything indicating they were other than stated in the petition for probate. The ruling of the court, to which appellants direct our attention in support of this argument, followed a question addressed to Ed Watkins, who filed the petition for probate, as to how he obtained the sums listed in the petition as accounts in bank, and the question whether Mrs. Watkins, at the time the will was made, obtained from him the amount of her indebtedness. The witness was asked if he knew what her debts were at the time she made the will and he said no; and that he had no conversation with decedent about it.

It is complained by appellants that the trial court erred by expressing bias and prejudice against contestants, by being officious and facetious, in constantly taking contestants' case out of their hands, and in aiding the proponents in the trial of their case. We find nothing in the record justifying any such criticisms and consider them not only unjustified but highly improper. And in this connection, since appellants assert that "their attorneys were very fair and honest in the presentation of their case," we note in their brief in this case a statement which is hardly of that nature for they state that "Mrs. Woods was called by the proponents, but irrespective of this fact, the trial court allowed the proponents to cross-examine her, due to the surprise. It is hard to see how, under the circumstances of this case, a proponent could be surprised by his wife's testimony." The record shows that while Mrs. Wood was called by proponents as a witness to the will she was cross-examined only by counsel for contestants; that subsequently she was called as a witness by contestants themselves, and that it was their own counsel, and not the counsel of proponents, who were permitted to cross-examine her on the ground of surprise.

Appellants' final assertion of error on the part of the trial court is that it refused to permit Reise Kinser, son of Cora Kinser, to testify as to the "mental competency" of testatrix under section 1870, subdivision 10, of the Code of Civil Procedure. This witness testified that he last saw his grandmother in September, 1944, when he was in her home

for approximately ten days except for two days when he went to San Francisco; that he then tried to carry on a conversation with her but could not; that she did not know him; that previous to that he had seen her in February, 1943, on the occasion of her birthday, when he was in her home overnight; that he then spoke to her but there was no recognition—that is, she did not say anything; that he had seen her during 1940, 1941 and 1942, when he would be there for a week, or two or three. He was then asked: "Q. From your visits with her and your seeing her and talking with her and visiting at the ranch, have you an opinion as to her mental competency as of February, 1943? A. I do." Counsel for proponents objected on the ground he was not qualified as an intimate acquaintance. Counsel for contestants then asked the witness several questions as to the length of time he had spent at the farm in previous years and he said a week or ten days each year, during which time he saw her every day. He was asked then if from that he had an opinion as to her mental competency in February, 1943. His reply, "She was incompetent and unable to do her own work," was stricken out on objection thereto by proponents' counsel. The witness then stated, apparently as ground for his conclusion, that in February, 1943, and even previously, Mrs. Watkins was aged, infirm and unable to take care of herself; could not get out of her chair without help; had to be dressed in the mornings, and led to the table; "practically had to be taken care of like a baby"; that he never heard her suggest that it was time to eat; never saw her go to bed voluntarily; never saw her dress herself; had to be served at meals; did not see her reading; never saw her outside the house; going to the bathroom, she had to have assistance; did not see anyone submit checks to her in 1943. From the foregoing it is obvious that any opinion of this witness as to the competency of decedent to make a will in February, 1944, would have been valueless, since it would have been of no more probative value than the facts given by him upon which it was based. (*Estate of Short,* 7 Cal.App.2d 512, 526 [47 P.2d 555]; *Estate of Sexton,* 199 Cal. 759, 771 [251 P. 778]; *Estate of Nolan,* 25 Cal.App.2d 738 [78 P.2d 456].) Contestants, therefore, suffered no injury by the court's striking out the answer of the witness, even if it could be said that he was qualified as an "intimate acquaintance" under section 1870, subdivision 10, of the Code of Civil Pro-

cedure to testify as to the "mental sanity" of the testatrix. It is well settled that the determination of who are intimate acquaintances under that section is committed to the sound discretion of the trial court, and an appellate court will not interfere with the exercise of that discretion unless there has been a clear abuse of it. (*Estate of Rich,* 79 Cal.App.2d 22, 27 [179 P.2d 373].)

The appeal from the order denying a new trial is dismissed, and the decree of the trial court and its order admitting the will to probate are affirmed.

Peek, J., and Thompson, J., concurred.