[Civ. No. 13362.   First Dist., Div. Two.   Oct. 29, 1947.]

Estate of MARGARET O'CALLAGHAN, Deceased. JOHN F. GLASS, as Executor, etc., et al., Appellants, v. DANIEL O'CALLAGHAN, Respondent.

John Guthrie Heywood for Appellants.

Heller, Ehrman, White & McAuliffe, Lloyd W. Dinkelspiel and F. Whitney Tenney for Respondent.

NOURSE, P. J.—This is an appeal from a judgment on a unanimous verdict rendered against appellants who were the proponents of a will and codicil contested on the ground that they were procured by undue influence exerted on decedent by proponents.

Decedent, Margaret O'Callaghan, was at the time of her death on December 12, 1945, more than 85 years of age and her sister, Annie O'Callaghan, the sole survivor of the immediate family, was then about 80 years old. The contested will left the entire estate to Annie with the exception of a portrait, which was bequeathed to John Glass, a third cousin, who was also named executor. No provision was made for Dan O'Callaghan, nephew of Margaret, and only offspring of the O'Callaghan family.

Appellant, John Glass, and his wife met the O'Callaghan sisters first in 1926, and on a few other occasions in later years, but it was not until about the time of the death of the third O'Callaghan sister, Mrs. Mamie Pitcher, that the relationship between the Glasses and the O'Callaghans became at all intimate. In 1941, Glass began to perform minor tasks for Annie, "liason" for her, as she termed it. Later he acquired a power of attorney from her, with the right to draw on her bank account, and also became joint renter of her safety deposit box. Six months after acquiring power of attorney from Annie he secured Margaret's power of attorney and in 1945, the year of Margaret's death, he became joint renter of Margaret's safety deposit box.

The testimony offered at the trial brought out the diverse

characteristics in the personalities of the sisters Margaret and Annie. Margaret was a lady of culture and leisure, had been rather an accomplished pianist, and was greatly interested in art and religion. She had been crippled early in life, and in her later years suffered from arthritis, high blood pressure and a bad heart. Her hearing and eyesight were also somewhat impaired. During all the later years of her life she exhibited a great affection for her nephew Dan, his wife and children.

Annie was a tiny but forceful person, who lost her temper when opposed and talked in a shrill voice, occasionally brandishing her fists. She worked hard about the home, performing many of the household tasks. It was her belief that her efforts were largely responsible for the building up of the O'Callaghan estate. At the time of Mrs. Pitcher's death, Annie asserted a claim against the Pitcher estate for $30,000 for alleged services, which was not pressed as she secured the entire estate. She frequently claimed that she would collect $20,000 from Margaret's estate for similar services.

From 1929 on, both sisters lived at 2529-31 Baker Street, San Francisco, each occupying a separate flat. Margaret often expressed her fear of Annie's temper tantrums to various persons, among them her doctor, Dr. Fred Zumwalt, and her attorneys. A neighbor testified to having often heard Annie screaming at her sister. It was Margaret's habit to give up in arguments with Annie when she became too difficult. When Margaret communicated with her attorneys during the last years of her life, she would have someone take the messages out of the house without Annie's knowledge.

The most important item in the O'Callaghan estate was a piece of real property at 12th and Mission Streets, San Francisco, under lease to Firestone Tire & Rubber Company. This had been inherited from their mother by the three sisters in equal undivided shares. Florence McAuliffe of Heller, Ehrman, White & McAuliffe, was first employed by the O'Callaghans on a matter concerning this property in 1928, and from that time until about a year and a half before Margaret's death the firm continued to perform legal services for Margaret.

In 1941, upon Mamie Pitcher's death, it was discovered she had left a will bequeathing everything to Annie. Annie was also named executrix. Margaret, surprised at this disposition contemplated contesting the will. She told Florence McAuliffe at this time that she cared nothing herself for the property or money involved as she had sufficient for her needs,

"but I know that if I do not get half of it . . . it will not go to Dan and his children, it will go elsewhere." An agreement between Annie and Margaret was executed February 5, 1941, under which Margaret was to receive a portion of Mamie's estate in consideration of Margaret waiving her right to contest the will.

Glass, subsequent to the incident, began appearing as Annie's representative in the attorney's office. He informed McAuliffe that he was Annie's business manager and showed McAuliffe a letter from Annie requesting that Glass be given all papers, agreements and deeds in the Pitcher estate, of which Annie was executrix. On December 6, 1941, all such papers were turned over to Glass, and on January 26, 1942, Annie wrote McAuliffe, informing him that she did not recognize the agreement of February 5, 1941, *in re* the Pitcher estate. Glass had taken Annie to his wife's attorney who had prepared an agreement purporting to cancel the agreement of February 5, 1941. The typewritten date on the cancellation agreement is August 1, 1942, but it was changed in ink to 1943, when it was apparently executed. Margaret, while confined in a hospital, on August 1, 1943, wrote McAuliffe that Annie had brought out a document for her to sign abrogating the contract of February 5, 1941. Margaret wrote: "I asked her would she promise to leave that amount to Dan's two children. She promised before Dr. Aalders, so hold her to it when the paper comes to you." On December 5, 1943, Margaret wrote Attorney Toohig of McAuliffe's firm as follows: "Since 'phoning you the other day about the gravestone on my father's grave, my sister complains of being very ill, and as the doctor warned me sometime ago, she was in danger of a collapse, I have decided to let her have her way and I will ask you to finish the business of the contract. Tell Mr. Glass I have so decided, if he has the direction from my sister. I regret to have troubled you but my hands are tied for fear of consequences."

Margaret had shown a great interest in her nephew Dan and his family and frequently had stated that Dan and his children would be taken care of after her death. In the various wills and codicils which she executed, Dan, and later his children, were always provided for, with the exception of the will and codicil contested herein.

Numerous wills and codicils, both holographic and formal, executed by Margaret in the period beginning with 1933 up to the execution of the contested will of December 3, 1944,

were introduced as exhibits by respondents. The will of June 1, 1933, left the income of the residue of Margaret's estate to various persons, among them her sisters Mamie Pitcher and Annie, her brother Charles, providing that upon the death of the last survivor the trust was to cease and the principal vest in the Catholic Foreign Mission Society, known as the Maryknoll Fathers, provided that $60 per month be paid to her nephew Dan as long as he should live.

On June 12, 1937, Margaret wrote: "I made a will, now in custody of Florence McAuliffe, but since that time all but two mentioned in the will have died so I write out my wishes as clearly as possible and ask that this inclosed will be followed out." Said inclosed will left her entire estate in trust to pay income to her two sisters; upon their death the trust was to vest in the Maryknoll Fathers who were to pay half the income to her nephew. Attorney Toohig prepared a formal will for Margaret dated June 17, 1938, which created a trust of the residue of the estate for Mamie and Annie, providing upon their deaths the net income of the trust was to be divided equally between Dan for life and the Maryknoll Fathers; upon Dan's death half the trust estate was to vest in Dan's issue, if any, the other half, or all if Dan had no issue, to vest in the Maryknoll Fathers. On January 18, 1941, after Mamie's death, a holographic codicil was added providing that since Margaret had just learned that Annie received by Mamie's will all of her estate, she now left the share she had previously allotted to her two sisters to her nephew, Dan O'Callaghan. The codicil concluded: "I ask my trustees to see that the best income available is secured so that he, Dan and his family, may use the income now. My sister Annie is amply provided for and will not need further income."

In a will prepared by Toohig for Margaret dated February 5, 1941, there was a bequest of the residue of pictures, paintings, household furnishings to Dan, and trusts for Dan and the Maryknoll Fathers similar to those in previous wills. As to Annie, the will recites: "I have purposely made no provision in this will for my sister Annie O'Callaghan for the reason that she is amply provided for."

In another will of March 31, 1941, and one of June 5, 1941, with a codicil dated July 5, 1944, this latter will and codicil prepared by Attorney Toohig, the same pattern is followed out as in the earlier wills. The codicil of July 5, 1944, makes detailed bequests of personal items such as pic-

tures, an interest in a Steinway piano, statuettes, etc. It also changes the provision for the Maryknoll Fathers from an interest in a trust to a specific bequest of $5,000 cash. With this codicil she sent a letter of instructions to McAuliffe, ending as follows: "After a few days I will ring you up, when I have the privacy of the telephone here." All of the wills up through that of July 5, 1944, made very careful instructions for burial, the saying of masses, the disposition of specific paintings to certain galleries.

The contested will of December 3, 1944, and codicil of September 28, 1945, provides simply for the gift of all Margaret's estate to Annie, except the bequest of a minature portrait to Glass, and names Glass executor thereof.

Dan O'Callaghan testified that in June, 1945, when Margaret was spending a week at Dan's home, she told him not to work so hard as everything she had would go to him and the children, "because Annie is going to leave everything she has to Glass." She told Dan that everything that Annie had was going to the Glasses and she wanted him and his children to get one-third. Dr. Zumwalt, Margaret's physician, also testified that Margaret told him on several occasions that Annie was leaving her estate to Glass but that she (Margaret) had made a will leaving her estate to Dan. She also told the doctor that Annie was money hungry; she had already secured control of two-thirds of the O'Callaghan estate, and that since she had "hooked up" with John Glass she had become more money hungry than ever.

Glass testified that sometime before December 3, 1944, Margaret sent for him and informed him that she wished him to type a will for her, and delivered to him certain memoranda in her handwriting from which he typed the will. The memoranda were not produced and Glass stated that they had been returned to Margaret and that since then he had not seen them. In a deposition taken before trial, Glass testified that he did not know who *drew* the contested will. On the stand he testified that he typed the will. When confronted with the deposition, Glass explained that when he said he did not know who *drew* the will, that he had not actually seen Margaret writing it, though he had testified that it was in her handwriting. In the deposition he had stated that he had not prepared the will. He admitted having given this testimony, but on a later examination by his own counsel he explained that his answer that he had not prepared it was correct since he had just typed it from Margaret's memoranda.

The same explanation applied to the codicil. He testified that he did not know McAuliffe's firm were attorneys for Margaret although he had made many visits there for Annie in connection with the Pitcher estate, and that he did not know Margaret had an attorney. McAuliffe testified that he had told Glass that he was Margaret's attorney, and Jose Mass, witness for proponents, testified that he was present at the Glass home in Los Altos when Attorney Toohig called upon Margaret there in connection with the codicil of July 5, 1944. He stated that the Glasses were there when it was announced that one of the two gentlemen calling was Margaret's lawyer. Glass testified that sometime after he had typed and returned the will to Margaret she telephoned him that she wanted to go for an automobile ride, that she sounded "lonely," so he drove her to the beach and during the ride Margaret said she would like to have the will executed. He telephoned his friend John Murphy and arranged to have Mr. Murphy and his daughter Dorothy come out to the car to witness the will. He explained that there were numerous stairs leading up to the Murphy home, and because of Margaret's arthritis he would not ask her to go in. The Murphys came out to the car, Margaret produced the will from her handbag and the Murphys witnessed it. The codicil was executed in a similar manner. On this occasion Glass, his wife, Annie and Margaret were preparing to go to the country, when Margaret spoke to Glass about executing the codicil. He called up the Murphys, brought Margaret over to their home, had them witness it in the car, and then returned to the Glass home. Annie and his wife knew nothing about the incident, he said. On both occasions Glass remained present during the witnessing of the documents.

Margaret had been seriously ill in Franklin Hospital beginning June 9, 1945, and for a time thereafter at home; Stanford Hospital from October 28, 1945, to November 28, 1945; and entered Don Ra Doe Hospital November 30, 1945, where she died December 12, 1945, at the age of 85. She had been ill at Calistoga in July and August, 1943, was in a sanitarium in June, 1944, and in October, 1945.

Appellants contend that the evidence is insufficient to support the verdict; that the court erred in denying their motion for a nonsuit. They maintain that the facts set forth by respondent do not raise a presumption of undue influence and therefore do not impose upon appellants the obligation of presenting evidence of volition, citing *Estate of Hull,* 63

Cal.App.2d 135 [146 P.2d 242]. That case follows the rule that before the question of undue influence becomes one of fact for determination by the jury or court there must be evidence establishing (1) the relations between the one charged with undue influence and the decedent, affording the former opportunity to control the testamentary act; (2) decedent's condition must be such as to permit subversion of her freedom of will; (3) activity on the part of the person charged with exercising undue influence; and (4) such person must have unduly profited as beneficiary under the will; that a presumption of undue influence is not created by any one of these circumstances alone, but only when a combination of all are present is the denial of a nonsuit justified, placing upon proponent the burden of showing that it was executed free of undue influence. (See, also, *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935]; *Estate of Burns,* 26 Cal.App.2d 741, 749 [80 P.2d 77].)

Respondent does not quarrel with these rules of law, but answers that the evidence adduced herein sufficiently raises a presumption of undue influence. The evidence is reviewed showing proof of the confidential relationship, the physical and mental condition of the decedent, activity on the part of the beneficiary Glass in procuring execution of the will and codicil which respondent argues is sufficient under authority of *Estate of Baird,* 176 Cal. 381 [168 P. 561]; *Estate of Gallo,* 61 Cal.App. 163 [214 P. 496]; *Estate of Nutt,* 181 Cal. 522 [185 P. 393]; *Estate of Miller,* 16 Cal.App.2d 154 [60 P.2d 498], and see *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384].

If we were disposed to follow the practice of briefing the case we could argue at length on the question of the sufficiency of the evidence. But our function is merely to determine whether error was committed in the trial court. It should suffice therefore to merely recapitulate the evidence upon which the verdict is based disregarding the conflicts and according to the jury the assumption that it believed the testimony of respondent's witnesses. It should be said, however, that the parties argue the case from the erroneous premise that it is a "presumption" of undue influence which must be shown. Though cases have been cited to support this theory the true rule is emphasized in *Estate of Bristol, supra,* that, when two or more "inferences" can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.

Briefly, the facts upon which the jury's "inference" of undue influence rests are: There is a definite pattern in all the formal wills executed by deceased from June 1, 1933, to July 5, 1944, to provide for the descendants of her deceased brother, to contribute to the aid of Maryknoll Fathers, to provide for masses and adequate burial, and to distribute among numerous friends her many valuable objects of art. There is the oft-repeated assertions to her attorneys and friends of her intentions to make such disposition of her estate, of her belief that her sister Annie was well provided for, of her fear of this sister, and of her distrust of Glass. All these wills were prepared by a firm of attorneys in which she had complete trust and with whom she consulted in reference to her legal matters. There is the evidence of the activities of Glass first in relation to Annie, then as to deceased, which disclosed a premeditated plan to ingratiate himself with the two sisters for his own benefit; and the expressed fear of the deceased that he had succeeded in becoming Annie's legatee and was acting for her to get possession of decedent's estate. There is the unescapable fact that Glass's testimony was discredited on so many occasions that the jury would have been justified in rejecting his entire testimony.

These facts fully support the inference that Glass acting for himself and as attorney in fact for Annie exerted undue influence over the deceased in procuring the will from which both he and his principal would have benefited. The facts are such that, if the jury did reject the testimony of Glass as untrue, it could have fairly inferred that he prepared the contested will himself and that the deceased was in such poor physical and mental health as to render her readily susceptible to undue influence or imposition.

There is no question of error raised by appellant except that the evidence does not support the verdict and that the motion for a nonsuit should have been granted. The evidence is sufficient under the rule of *Estate of Teel, supra*. This being so it follows that the motion for a nonsuit was properly denied.

Judgment affirmed.

Goodell, J., and Dooling, J., concurred.

A petition for a rehearing was denied November 28, 1947, and appellants' petition for a hearing by the Supreme Court was denied December 22, 1947.