[Civ. No. 21371. First Dist., Div. One. Feb. 19, 1964.]

Estate of ETHELYN FRENCH, Deceased. WILLIAM FRENCH, Plaintiff and Appellant, v. ROSEMARIE G. MASON et al., Defendants and Respondents.

Warren C. Moore for Plaintiff and Appellant.

Rankin, Oneal, Luckhardt, Center, Longinotti & Ingram, Maurice J. Rankin and Charles E. Luckhardt, Jr., for Defendants and Respondents.

SULLIVAN, J.—In this will contest we hold that the document admitted to probate by the court below is supported by the necessary testamentary intent and satisfies the statutory requirements for a valid holograph. Additionally, we conclude that the record sustains the court's finding that the will in question was not the product of undue influence. We therefore affirm the judgment.

The pertinent facts follow. Decedent, Ethelyn French, died in San Jose on April 22, 1962, at the age of approximately 75 years. She was survived by three children: William French, appellant herein, and Rosemarie Mason and Jane Sturgis, respondents herein.

She left a document entirely handwritten in ink on what appears to be a page of ruled notebook paper approximately 3 inches wide by 5 inches long. ▇ The contents of the

document, written lengthwise on one side of the paper only, are set forth as follows:[1]

March, 17, 1 9 6 1

Jane I w a n t you to h a v e
my home. Thanks for helping.
this place ∧ or in other words. You
have done for me w h a t n o n e
others would. It is yours a n d
you can do as you please. Y o u
can give what you want to. | Your mother
To Jane Sturges from | Ethelyn French

On May 25, 1962, Rosemarie Mason filed in the court below a first amended petition for the probate of the aforesaid document and the issuance to her of letters of administration with the will annexed.[2] William French thereupon filed a contest of the will on the grounds of decedent's unsoundness of mind, her lack of freedom from undue influence and of the lack of due execution of the document involved.

At the ensuing trial before the court sitting without a jury evidence was first offered by the proponent in order to make a prima facie showing of the execution of the will. To this end, Jane Sturgis, the sole beneficiary of the will, was called as the first witness. She was thereafter extensively cross-examined by appellant. The record clearly indicates that she was the principal witness in support of the will.

Jane testified on direct examination that on or about the date of the document in controversy, March 17, 1961, while she was serving her mother breakfast, the latter handed her the document, saying "This is your house, and this is the will. I want you to take it and keep it in a safe place." Thereafter Jane kept the will in her suitcase. She further testified that she had seen her mother write on many occasions over the years, that she was familiar with her handwriting, and that the document in question was entirely written, dated and signed in her mother's handwriting.[3]

Her testimony on cross-examination, so far as pertinent here, can be summarized as follows: The decedent had suffered

---

[1]The original document is before us. We reproduce the same arrangement of words, line by line.

[2]Rosemarie filed said petition as the nominee of Jane, who, although the sole beneficiary of the will, could not qualify as administratrix because of residence in Arizona. (Prob. Code, §§ 420, 422, 423.)

[3]It is unnecessary to discuss the balance of her testimony on direct examination which was offered as part of proponent's prima facie case.

a broken hip in 1955. From time to time thereafter Jane made trips from her home in Arizona to San Jose in order to care for her mother. The decedent, likewise, visited Jane in Arizona. During the last three years of decedent's life, there was a close relationship between mother and daughter. Jane was with the decedent "practically constantly." It was probably a closer relationship than that existing between decedent and her other two children. During the last two years of decedent's life, Jane and the decedent maintained a joint bank account in San Jose; during the last year, Jane handled most of her mother's business for her. In December 1961, about four months before decedent's death, Jane was appointed her conservator. In January 1962, while Jane was in Arizona, the decedent suffered a stroke and was committed to Agnew State Hospital on arrangements allegedly made by appellant. Jane returned to California, secured her mother's discharge from the hospital,[4] returned her to her home in San Jose and remained with her until her death.

Prior to March 17, 1961, the decedent had never discussed her will with Jane although she had often said she was going to leave Jane her home. She handed Jane the will at about 10 a.m. on the day in question. Decedent was then in her bedroom sitting on the side of her bed and next to a bedside table. Jane had just brought her breakfast. She had seen her mother earlier that morning at about 6 a.m. when she served her tea and toast. In the interim her mother was resting.

Although Jane had been in and out of the room, she had not paid much attention to what her mother was doing. When asked "Did you see her writing," Jane replied: "Well, I knew she had her pencil and paper. But I didn't know what she was doing until she handed it to me." She testified however that she saw her mother sign her name to the document, that the latter then handed it to her with the remark "I want you to keep this," and that her mother never took the document back to make any corrections. Jane was unable to describe the pen used by her mother: "She had all kinds of pens."

Jane's testimony was corroborated to some extent by that of the decedent's sister, Angela Kerr, who testified that "sometime in '61," approximately in March or April, the decedent had mentioned to her that she had made a will for Jane to have the property. Mrs. Kerr also testified that the

---

[4]She testified: "I brought her home because she wasn't mentally ill. She was just sick. She had just had a stroke."

decedent repeatedly stated that "Jane did the most for her."

William French, the contestant and appellant herein, testified that he had seen his mother quite often between 1955 and 1961. However he had not seen her at all from March 1961 until her death. He denied having her committed to Agnew State Hospital and stated that he first learned of such fact after her death. He also stated that on one occasion his mother told him "that Jane attempted to get her to sign the will over to her." William's wife, Dorothy French, generally corroborated her husband's testimony that the decedent frequently visited her son. She testified to a relationship devoid of arguments and to decedent's desire that her three children should share her property equally. According to her, the decedent became forgetful in 1959 and in March 1961 seemed confused and "was sort of like she was in a stupor." Mrs. French was not cross-examined.

Lowell Bradford, an expert examiner of questioned documents, called as a witness by appellant stated that he had examined the document in controversy as well as samples of handwriting known to be the decedent's. He testified that it was his opinion that the body of the will, excepting the date March 17, 1961, at the top of the document, had been written by the decedent but that the date "was written after the remainder of the writing." The witness based this conclusion on his microscopic examination of the document which indicated that the ink of the word "March" in the date "lies on top of the other ink" of the word "to" in the line immediately below. Bradford was unable to state whether or not the same person who had written the body of the document, had also written the date.[5]

The trial court found, so far as is here pertinent, that the instrument offered for probate was entirely written, dated and signed in decedent's handwriting; that it was prepared with the intent that it would be effective as a will; that at the time of the execution of the instrument, the decedent was of sound and disposing mind; that at said time she was not suffering under any undue influence of Jane; that at said time "her thought processes" were not impaired by ill health or advanced age; and that nothing more than a mother-

[5]On cross-examination, Bradford testified: "Q. And I also understood you to say, and I think you are quite fair about it, that you can't say whether or not the 'March 17' was written by the same person who wrote the body of the document? A. I cannot, no. Q. So you can't say that she didn't write it, can you? A. I cannot."

daughter relationship existed between decedent and Jane which was not a confidential one. From its findings the court concluded that the instrument dated March 17, 1961, was "a valid holographic Will executed by the decedent in the manner and form required by law and is entitled to be admitted to probate"; that no undue influence was exercised upon decedent by Jane or any person; that decedent was of sound mind; that the instrument in question was her last will; and that the petitioner Rosemarie Mason was entitled to letters of administration with the will annexed. Judgment was rendered accordingly.

Appellant contends here that (1) the instrument is not a will, since there was no testamentary intent; (2) the instrument is not a valid holograph, since it is not dated in the decedent's handwriting; and (3) the proponent failed to rebut a prima facie presumption of undue influence. As we indicated at the outset, none of these contentions have merit.

Our determination of the first issue is governed by the following principles: "Before an instrument may be probated as a will it must appear from its terms, viewed in the light of the surrounding circumstances, that it was executed with testamentary intent. The testator must have intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take effect upon his death." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95 [216 P.2d 850, 21 A.L.R.2d 307], and cases there collected.) "No particular words are necessary to show a testamentary intent but it must satisfactorily appear from the document offered as the last will and testament that the decedent intended, by the very paper itself, to make a disposition of his property after his death in favor of the party claiming thereunder." (*Estate of Wunderle* (1947) 30 Cal.2d 274, 280-281 [181 P.2d 874], citing *Estate of Button* (1930) 209 Cal. 325, 331 [287 P. 964]; *Estate of Kelleher* (1927) 202 Cal. 124, 129 [259 P. 437, 54 A.L.R. 913]; *Estate of Branick* (1916) 172 Cal. 482, 484 [157 P. 238]; *Estate of Pagel* (1942) 52 Cal. App.2d 38, 44 [125 P.2d 853].) "If the prerequisite testamentary intent does not appear from the face of the instrument itself, reference may be made to the circumstances of its execution, and the language will be construed in the light of those circumstances. [Citations.]" (*Estate of Spies* (1948) 86 Cal.App.2d 87, 90 [194 P.2d 83]; see also *Estate of Spitzer* (1925) 196 Cal. 301, 307 [237 P. 739].) As was said in *Estate of Golder* (1948) 31 Cal.2d 848 at page 850

[193 P.2d 465], "[w]hen words which may be construed as testamentary are used in an informal document such as a letter, and it is not entirely clear that the writer intends thereby to control the disposition of his property at his death, the courts have been very liberal in admitting extrinsic evidence to show intent." ▆ Declarations of a testator "whether made at, before, or after the execution of the instrument are admissible, if offered for the purpose of ascertaining the intent with which the instrument was executed [citations], and not for the purpose of proving the meaning the testator attributed to specific provisions of an admitted will. [Citations.] ▆ 'Such ... declarations of intent to make a will are admissible when the attempt is not to explain an ambiguity but to show the testamentary character of a letter.' [Citations.]" (*Estate of Sargavak, supra,* 35 Cal.2d 93, 97.)

▆ Applying the foregoing principles to the problem before us, we are satisfied that the instant record supports the finding of the court below. It is manifest that the document dated March 17, 1961, when viewed in the light of the surrounding circumstances and of the declarations of the testatrix, was executed with the requisite testamentary intent. The document itself discloses this intent although perhaps not with full clarity because of its informality. It expresses a desire upon the part of its author to give Jane the home, gratitude to Jane for her assistance, and an assurance of absolute ownership of the subject property. If the testamentary intent of the writer is somewhat blurred by the informality of the document, it is nevertheless easily perceptible and brought into sharp focus by the extrinsic evidence. Existence of such intent is shown by the declaration of the testatrix at the time she handed the document to her daughter: "This is your house, and this is the will. I want you to take it and keep it in a safe place"; it is apparent from her frequent declarations to Jane on previous occasions that she was going to leave the latter her home; it is also found in the decedent's declaration to her sister Mrs. Kerr that she had made a will "for Jane to have the property." Other background circumstances add their confirming impact: the existence of a close relationship between mother and daughter and the latter's constant care, attention and solicitude for the decedent, all of which appear consistent with the expressions of gratitude found in the writing. Having in mind Mrs. Kerr's testimony mentioned above, it is significant that no other docu-

ment of a testamentary character was found. It is also significant that appellant himself gives no testimony contradicting the above evidence of testamentary intent. In our view the writing itself, together with the above evidence, clearly shows that the decedent intended by the document in controversy to dispose of her property to Jane at her death.

■ Appellant claims that the document states, with reference to decedent's home "It is yours . . ." and that it concludes with the statement, "You can give what you want to your mother." (See contents of document, *supra*.) On this asserted basis, appellant argues that the only way any logical meaning can be given to the above expressions is by concluding that the decedent intended to make a *present* disposition of her property.

From our examination of the original instrument which has been brought before us, we are convinced that there is no basis for such a construction of the language referred to. As we see it, the last part of the document reads as follows: "It is yours and you can do as you please. You can give what you want to. To Jane Sturges from Your mother Ethelyn French." The testatrix inserted a period after the word "to" in the final sentence of the document. In addition she placed a heavy line between the word "to" and the word "Your" and extending down to the next line so as to divide the word "from" and the word "Ethelyn."[6] The effect of the line is to block off the words: "Your mother Ethelyn French" the first two words being on one line and the last two words on the line immediately below. In view of the punctuation mark (period) and bold line above described we believe that the reading of the document as indicated above makes good sense. Appellant urges that since "the paper is sprinkled with dots" we should not view the dot after the word "to" as a punctuation mark. It is true that the paper contains a number of ink dots most of which are between the lines. However, we think the document answers appellant's argument: It reveals that in all places in the body of the writing where one might possibly insert a period to indicate the termination of the expression of an idea, such a mark is found. But there is no "dot" at all after the word "mother." If we were to accept appellant's construction of the last sentence ("You can give what you want to your mother") we would not only ignore the dot after "to" but we would

---

[6]See will as set forth *in toto, supra.*

have only one sentence in the document *having no period at the end of it.*

■ Appellant's further argument that the document purported to effect a present transfer of property and was therefore not testamentary, because "no words denoting future tense were employed" deserves no extended discussion. It is common knowledge that wills usually employ verbs in the present tense.

We turn to consider appellant's attack on the holographic character of the document. He asserts that the date is not in decedent's handwriting. Obviously, if this is true, the defect is fatal. (Prob. Code, § 53.)

The trial court found that the document was entirely written, dated and signed in the decedent's handwriting. This finding is supported by Jane's testimony set forth *supra.* It is not directly contradicted by appellant's witness Bradford who, although conceding that the body of the instrument was in decedent's handwriting, was unable to state whether or not she wrote the date.

However, as we have already pointed out, Bradford expressed the opinion that the date was written *"after* the remainder of the writing" (italics added) because on examination of the document he found that the ink of the word "March" in the date "lies on top of the other ink" of the word "to" in the line immediately below. On this fundament appellant constructs the following argument: It is apparent to the naked eye that the date is written in a different color or shade of ink (we are inclined to agree); according to Bradford, the date was written after the remainder of the document; according to Jane Sturgis, she saw her mother sign her name to the document after which she handed it to Jane but never took it back to make any corrections; therefore, argues appellant, since the decedent never had access to the document thereafter, someone else must have written the date. Appellant's position seems to be that the above is the only reasonable inference which the court could have drawn from the evidence.

In essence appellant's argument amounts to this: that the court could not, as it did, accept Jane's testimony that the document was entirely written, dated and signed in decedent's handwriting and at the same time accept her testimony that the decedent signed her name, handed the document to Jane but did not thereafter make any corrections. Appellant seems to feel that the trial judge must accept or reject the testimony of a witness in its entirety. ■ However "the

credibility of a witness and the weight to be accorded to his testimony are questions directed to the trial judge, who under proper circumstances may accept all or such part of the testimony of any witness as he believes to be true, or may reject all or any part which he believes to be untrue.'' (*Bechtold* v. *Bishop & Co., Inc.* (1940) 16 Cal.2d 285, 291 [105 P.2d 984].) It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. (*People* v. *Davis* (1957) 48 Cal.2d 241, 248 [309 P.2d 1]; *People* v. *Crooker* (1956) 47 Cal.2d 348, 355 [303 P.2d 753], affirmed 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448]; *Chan* v. *Title Ins. & Trust Co.* (1952) 39 Cal.2d 253, 258 [246 P.2d 632]; *People* v. *Rodriguez* (1959) 169 Cal.App.2d 771, 776 [338 P.2d 41].) It is conceivable that the trial judge may have accepted the testimony of Jane, who was familiar with her mother's handwriting, that the date as well as the balance of the instrument was written by the decedent and rejected that portion of Jane's testimony to the effect that the last part written by the decedent was her name, because the court believed it was inaccurate or incorrect. (See *People* v. *Coleman* (1955) 134 Cal.App.2d 594, 598 [286 P.2d 582].) The trial judge may have believed that Jane was mistaken and that the last part which she saw decedent writing was the date. Or he could have also reasonably inferred that the decedent, who had many pens, had in the course of writing the will and at some time after she had written the first line of the body of the document, picked up a different pen to inscribe the date, returning after some interval to the same pen, or even perhaps another pen similar to the one with which she started her writing. Appellant merely urges upon us an opposing inference to that drawn by the trial court. Even if we were of the opinion that it was the more reasonable inference, we would have no power to substitute our deductions for those of the trial court. (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 694 [299 P.2d 231]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Hamilton* v. *Pacific Elec. Ry. Co.* (1939) 12 Cal.2d 598, 602 [86 P.2d 829]; *Mah See* v. *North American Acc. Ins. Co.* (1923) 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123][7].)

Finally appellant argues that a presumption of undue

7Overruled on other grounds in *Zuckerman* v. *Underwriters at Lloyd's, London* (1954) 42 Cal.2d 460, 474 [267 P.2d 777].

influence arose from the evidence and that the proponent of the will failed to rebut it. He urges that such presumption finds its basis in the presence of certain indicia of undue influence given recognition in the case law, citing *inter alia Estate of Yale* (1931) 214 Cal. 115 [4 P.2d 153].[8] He accordingly enumerates, as existent herein, the five indicia listed in *Yale, supra,* and adds, as a sixth: ''Confidential relationship between the beneficiary and testator,'' in an obvious parallel to the factual situation in that case. Marshalling all of these factors, appellant directs his attack at the confidential relationship between Jane and her mother and at the alleged activity of the former in procuring the execution of the will.

Thus appellant invokes the rule that a presumption of undue influence arises from proof of a confidential relationship between a beneficiary and a testator coupled with activity on the part of the beneficiary in the preparation of the will. (*Estate of Higgins* (1909) 156 Cal. 257, 261-262 [104 P. 6]; *Estate of Graves* (1927) 202 Cal. 258, 262-263 [259 P. 935].)

However, the presumption on which appellant relies is rebuttable. (*Estate of Higgins, supra; Estate of Hall* (1958) 158 Cal.App.2d 466, 474 [322 P.2d 1011].) Assuming without deciding that the above rule is properly applicable under the circumstances of the instant case, nevertheless the law is settled that whether or not the presumption has been rebutted and overcome is a question of fact for the trier of fact whose determination of such issue will be binding on appeal unless without evidentiary support. (*Estate of Lances* (1932) 216 Cal. 397, 404 [14 P.2d 768]; *Estate of Berry* (1925) 195 Cal. 354, 363-364 [233 P. 330]; *Estate of Gecht* (1958) 165 Cal.App.2d 431, 444 [331 P.2d 1019]; *Estate of Teed* (1955) 136 Cal.App.2d 401, 405 [288 P.2d 921]; *Estate of White* (1954) 128 Cal.App.2d 659, 669 [276 P.2d 11];

[8]In *Estate of Yale, supra,* 214 Cal. 115, 122, the indicia of undue influence found to be there present were stated as follows: ''(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.'' The court in *Yale* found that in addition to the foregoing indicia, a confidential relationship existed between one of the beneficiaries and the decedent. (See also *Estate of Lingenfelter* (1952) 38 Cal.2d 571, 585 [241 P.2d 990].)

*Estate of Corbett* (1954) 123 Cal.App.2d 465, 471 [266 P.2d 935].)

We are convinced from our examination of the evidence summarized by us *supra*, that the trial court was justified in concluding that any presumption of undue influence had been overcome. We need not repeat this evidence in detail. Indeed the testimony of Jane Sturgis alone which was apparently believed by the trier of fact is sufficient to support the court's finding on the issue of undue influence. This testimony shows a closer, deeper and apparently more affectionate relationship between the decedent and Jane than between the decedent and her other children, thus giving a rational explanation for the decedent's making Jane the sole beneficiary and thus dissipating the claim the will was unnatural. Jane's testimony, as well as that of Mrs. Kerr, shows that the will was consistent with declarations of the decedent as to how she desired to dispose of her property. Assuming that a confidential relationship existed between Jane and her mother[9] there is no evidence showing Jane's use of such confidential relationship at the time of the execution of the will to overcome the free will and desire of the testatrix. There is likewise no evidence that Jane was active in procuring the preparation or execution of the will. Indeed the evidence, which the trial court apparently believed and accepted, is that Jane not only failed to exercise any control over her mother's testamentary act but on the occasion in question was completely unaware that her mother was writing a will until the latter handed the document to Jane. (See *Estate of Fritschi* (1963) 60 Cal.2d 367, 373-374 [33 Cal. Rptr. 264, 384 P.2d 656]; *Estate of Shay* (1925) 196 Cal. 355, 363-364 [237 P. 1079]; *Estate of Ricks* (1911) 160 Cal. 450, 461-462 [117 P. 532]; *Estate of Watkins* (1947) 81 Cal. App.2d 465, 475 [184 P.2d 192]; *Estate of Burns* (1938) 26 Cal.App.2d 741, 749 [80 P.2d 77].) The evidence amply supports the finding of the trial court that the testatrix was free of any undue influence at the time she executed the will.

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

---

[9]The trial court's finding against the existence of such relationship is in our view contrary to the evidence. However this does not affect our conclusion herein, since we have assumed the existence of such relationship.