[Civ. No. 29588.   Second Dist., Div. Four.   Dec. 3, 1965.]

Estate of MAUDE FRIES, Deceased. VIRGIL V. BECKER, as Executor, etc., Petitioner and Appellant, v. GEORGE BEADLES et al., Objectors and Respondents.

Cecil L. Whitehead for Petitioner and Appellant.

Benjamin P. Riskin for Objectors and Respondents.

FILES, P. J.—When the petition for final distribution came on for hearing the probate court received evidence and then made its decree which among other things construed the will and determined the persons to whom distribution should be made. Walter Fries, the surviving spouse, appealed from that portion of the decree. The appellate court concluded that the probate court had erred in preventing the appellant from offering some evidence at the hearing, and upon that ground reversed the order for further proceedings in the probate court. (*Estate of Fries,* 221 Cal.App.2d 725 [34 Cal. Rptr. 749].)

Following remand, the probate court conducted a further hearing for the purpose of determining the persons to whom distribution should be made. After receiving all of the evidence which was offered, the court made findings of fact and ordered that the estate be distributed according to the law of intestate succession, that is, one half to the surviving spouse and one half to be divided equally among the sister, brother and niece of the decedent. The surviving spouse, Walter Fries, appealed from that order.

During the pendency of the appeal Walter Fries died and his executor, Virgil Becker, has been substituted as a party here. For convenience, throughout this opinion Walter Fries will be referred to as "appellant."

The controversy arises out of the fact that the decedent left a will which she had prepared upon a printed form, which fails to name a beneficiary.

The first page of the will contains the following language: (The printed words are here reproduced in roman type and the writing in italics.)

"Last Will and Testament

"I, *Maude Fries Maude Lamar,* a resident of *742 No. Orange Drive Los Angeles,* California, declare this to be my last Will and revoke all other Wills previously made by me:

"First: *I order and direct that my Executor hereinafter named pay all my just debts and funeral expenses as soon after my decease as conviently* [sic] *may be.*

"*Second. After the payment of such funeral expenses and debts, I give, devise and bequeth* [sic] *all property both personal and real, and stocks or bonds, notes or mortgages, now held or that I may acquire after date below.*

"*Lastly, I make, constitute and appoint my husband Walter Fries (to act with out any bond) to be Exectuor* [sic] *of*

*this, my last will and testament, hereby revoking all former wills by me made.*

*"Maude Lamar Maude Fries"*

The second page of the form is completely blank. The third page contains only the following:

"I appoint *Walter Fries* as Executt*or* [*sic*] of this Will.

"This Will was signed by me on the *29* day of *Janurary,* [*sic*] *1960,* at *Los Angeles,* California.

*"Maude Lamar Fries*
*"Maude Fries*

. "The Foregoing Instrument was, on the date thereof, signed by the test*ator,* in our presence, we being present at the same time, and *S*he then declared to us that the said instrument was h*er* last Will; and we, at the request of said *test ator,* and in h*er* presence, and in the presence of each other, have signed the same as witnesses. We further declare that at the time of signing this will the said *test ator* appeared to be of sound and disposing mind and memory and not acting under duress, menace, fraud or the undue influence of any person whomsoever.

*"G. David Heine* residing at *707 Ridgewood Pl.*
Signature of Witness                                        *Los Angeles*

*"W. F. Edwards* residing at *6006 Matilija*
Signature of Witness                                        *Van Nuys*

*" R. T. Malenfrew* residing at *3740 Paraiso Wy*
Signature of Witness                                        *Glendale"*

The fourth page, which was the back cover, contains this:

"Last Will and Testament
"of
*"Maude Lamar*
*"Maude Fries*
*"742 No. Orange Dr.*
"Dated *May 15, 1959"*

It has been appellant's contention throughout that the testatrix believed that the word "executor" meant "beneficiary," and that the will should be construed as bequeathing the entire estate to him in accordance with this alleged intention. At the hearing appellant offered his own testimony, as well as some other evidence, in the attempt to prove that the testatrix had had such an understanding and inten-

tion. Other evidence conflicting with appellant's testimony was introduced by respondents.

On this appeal appellant does not contend that the probate court excluded any of his evidence, nor does he claim that any other error of procedure was made below. His sole contention here is that this court should now construe the will in his favor, contrary to the interpretation given to it by the probate court.

The function of an appellate court when the interpretation of a written instrument is in question has recently been explained in *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] : "The interpretation of a written instrument, even though it involves what might properly be called questions of fact (see Thayer, Preliminary Treatise on Evidence, pp. 202-204), is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (See Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866.) Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. (Civ. Code, §§ 1638, 1639; Code Civ. Proc., § 1856.) It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' "

In the *Parsons* case there was no conflict in the extrinsic evidence, and the Supreme Court therefore proceeded to make its own interpretation of the meaning of the instrument. In the case at bench there are some conflicts in the evidence and the probate court was required to pass upon the credibility of witnesses. Thus this case falls within the exception noted in the *Parsons* case.

Where there is conflicting testimony, reviewing courts recognize that the trier of the facts has the better opportunity to judge the credibility of witnesses. In such a case the trial court's findings of fact, to the extent that they rest upon an evaluation of credibility, should be regarded as conclusive on appeal.

In the case at bench the record amply supports the findings of fact made by the trial court and the interpretation which it gave to the will. To begin with, the words used in the will are clear and unambiguous when read literally. It is a perfectly reasonable inference that the testatrix knew the meaning of the words she used, and that she intended the will be interpreted literally, i.e., as nominating an executor and nothing more.

"The fact that a testator nominates an executor, but, without giving a legacy or devising any part of his property, makes it none the less a will." (*In re Hickman,* 101 Cal. 609, 613 [36 P. 118].)

Probate Code section 106 provides: "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained. Technical words are not necessary to give effect to any species of disposition by a will; but technical words in a will are to be taken in their technical sense, unless the context clearly indicates a contrary intention, or unless it satisfactorily appears that the will was drawn solely by the testator, and that he was unacquainted with such technical sense."

There was evidence that at the time of her death the testatrix was nearly 74 years of age and that appellant was 53. They had been married 10 years. The marital relationship was not entirely harmonious. Between 1954 and 1958 three divorce proceedings, containing charges and countercharges of cruelty, had been commenced and dismissed. Her separate property was one source of friction. All of her bank accounts were carried in her former name "Maude Lamar." The home in which they lived was in her name as "Maude Lamar." Appellant himself testified that on one occasion in 1956 he "gave her about six days" to sign over the house so as to make it community property.

Respondents produced testimony that the testatrix was afraid of her husband and that she talked about how he had choked and beaten her. She was very fond of her sister and her niece, but when letters from the sister arrived at the home appellant would tear them up before she could receive them. She used a housekeeper in her home to communicate with the sister. Testatrix instructed the housekeeper to deliver some clothes and a diamond ring to the sister when she had an opportunity to take them out of the house without appellant's knowing about it. Sometimes testatrix gave

things to the housekeeper to place in her car so as to hide them from appellant. The housekeeper recalled a day during the year before her death when the testatrix had said that appellant had choked her and knocked her down and that she had signed some papers because he would have killed her if she hadn't.

Appellant denied that he had choked or beaten his wife. He testified that in September 1958, while their third divorce case was pending, she begged him to come back to her, and he then told her that "Before I would leave the hotel and go back with her or dismiss the divorce suit she would have to leave me everything, everything would have to be put in my name." According to appellant, she replied " 'I am willing to give you everything if you will come back and take care of me and protect me from now on.' "

On May 13, 1959, decedent and appellant went to the office of a savings and loan association where she had $10,000 on deposit. She withdrew $5,000, which was then deposited in a bank checking account in her name, but subject to appellant's power of withdrawal. The remaining $5,000 was left in the savings and loan association, but the name of the account was changed to "Maude Lamar as trustee for Walter Fries." The date appearing on the back of decedent's will is just two days after this transaction.

Appellant's attorney read into evidence a document which purported to be the last will of Joseph Cyprian Lamar of Chicago, a former husband of decedent, which appointed his wife as executrix but set forth no bequests. Joseph's will contains language identical to that found in the three hand-written paragraphs of decedent's will, except that the latter names Walter Fries as executor while the former names Maude Peal Lamar as executrix.

Appellant testified that on May 15, 1959, he saw that his wife was writing something and he became curious and walked over to see what she was doing. He observed that she was copying the Joseph Cyprian Lamar will. After she was finished she handed him "both wills"—i.e., her will and Joseph's will—and told him to keep them. Appellant testified that he took them and placed them in a drawer in the living room.

This testimony was in conflict with the testimony which appellant had originally given in his deposition taken October 21, 1961. In the deposition he had said that he was not present when his wife had written her will, that afterwards

she had shown it to him, but he did not examine it and did not ask any questions about it. "That is all I know about it," he said in his deposition. This testimony was read into the record by respondents at the first trial January 8, 1962.

It was not until the retrial on June 15, 1964, that appellant repudiated the testimony given in his 1961 deposition and told the court he had watched his wife copy Joseph's will. When asked by his own attorney to state his reason for saying earlier "that you didn't know what she was doing," appellant replied:

"A. The reason was that I didn't want anybody to know that I was using any undue influence in making this will, and that is why I did what I did do. That is my answer.

"Q. Did you use any influence? A. No, I didn't."

There was also evidence that there had never been any administration of the estate of Joseph Cyprian Lamar. The record is not clear as to what decedent had received on Lamar's death. At the oral argument counsel stipulated that all she received was proceeds of life insurance.

The findings of fact made by the probate court include the following paragraphs:

"3. That it was not the intention of the decedent, Maude Fries, to make Walter Fries, her husband, the beneficiary of her Will; she was being importuned by her husband to make a Will; that she was able to satisfy her husband by executing the Will, which merely provided for the payment of her debts and the appointment of an Executor, all of which is proper to make a valid Will.

"4. That the decedent was not inexperienced with relation to Wills; that she had the advantage of her previous husband's Will whereby she received his estate but not under the said predeceased husband's Will.

"5. That the decedent had relatives whom she wished to remember, and that the decedent knew from her own previous experience that her present husband would receive his share of her property and by executing her Will in the form and by using the language therein she thus carried out her testamentary intent."

The decision made by the probate court here is not in conflict with anything decided in *Estate of Karkeet*, 56 Cal. 2d 277 [14 Cal.Rptr. 664, 363 P.2d 896]. In that case the testatrix had no known kindred. She left a holographic will which named a close friend, Leah Selix, "to act as executrix." The probate court interpreted the will as a bequest of

the entire estate to Miss Selix. The State of California appealed, claiming that the estate must escheat because there was no bequest and there were no known heirs. The Supreme Court pointed out that the cardinal rule is that a will is to be construed according to the intention of the testator, and that, under the circumstances there shown, it was a reasonable inference that the testatrix had intended to leave everything to Miss Selix. The court then said, ''We cannot say, however, that such a conclusion is compelled as a matter of law from the will itself.'' (56 Cal.2d at p. 283.) The judgment in favor of Miss Selix was reversed because the probate court had refused to receive extrinsic evidence on the issue of the testatrix' intent.

In the case at bench the court received all of the evidence which either side offered for the purpose of ascertaining the intent of the testatrix. Much of the extrinsic evidence supports the view that the testatrix did not intend to cut off her blood relatives and leave everything to her demanding husband.

The probate court was not required to give full credence to appellant's story. It was entitled to believe some parts and reject others. (*Estate of French*, 225 Cal.App.2d 9, 18 [36 Cal.Rptr. 908].) The value of his testimony had to be considered in the light of its internal contradictions, the conflicting testimony of other witnesses and his interest in the cause.

■ It should be noted that most of the findings quoted above are merely explanatory of the ultimate fact which determines this controversy: that it was not the intention of the decedent to make appellant the beneficiary of her entire estate. Giving the respondents the benefit of the testimony most favorable to them where credibility was in question, and making our own evaluation of the inferences to be drawn from the evidence which is not in conflict, we cannot say that the probate court's interpretation of the will was erroneous.

The order is affirmed.

Jefferson, J., and Kingsley, J., concurred.