[No. B097946. Second Dist., Div. Six. Dec. 10, 1996.]

Estate of DOROTHY SOUTHWORTH, Deceased.
JEANETTE SOUTHWORTH et al., Contestants and Appellants, v.
NORTH SHORE ANIMAL LEAGUE, Objector and Respondent.

**COUNSEL**

Diane M. Matsinger and David C. Turpin for Contestants and Appellants.

Robert B. Hutchins for Objector and Respondent.

## OPINION

**GILBERT, J.**—A charitable donor card contains printed language showing an intent to make a future gift to the charity. In the blank space following the printed words a testator writes that her entire estate is to be left to the charity. She signs and dates the donor card. Does her handwriting on the donor card constitute a holographic will? No.

The trial court admitted a donor card into probate as a holographic will. Half siblings, Jeanette Southworth, Jack Southworth, and an heir finder, Francis V. See, appeal from the judgment of the trial court in favor of respondent, North Shore Animal League (NSAL).

According to Probate Code section 6111, the material provisions of a holographic will must be in the handwriting of the testator, and the required testamentary intent may be set forth either in a holographic will or as part of a commercially printed form will. Because the handwriting here incorporates printed material on a donor card stating the future intention of Dorothy Southworth, the deceased, we reverse the judgment.

### FACTS

Decedent never married and had no children. On March 4, 1986, in response to decedent's request for information, NSAL sent a letter to her describing its lifetime pet care program and explaining how to register for it. NSAL asked that she return its enclosed pet care registration card, contact her attorney to include her bequest to NSAL in her estate and send a copy of the bequest to NSAL. NSAL informed her that "[e]ven if you don't currently have a will, we'll accept your Registration on good faith and maintain an Active file on your pet while you're arranging the Bequest." Decedent never returned the registration card to NSAL.

On September 4, 1987, decedent requested registration with the Neptune Society for cremation of her body upon her death. On the registration form, she stated that she never married and that Neptune should contact the Ventura County Coroner to make arrangements. On the same date, decedent sent a letter to NSAL asking whether or not it destroys animals.

Her letter to NSAL states, "I have been terribly upset since I heard [that NSAL destroys animals] because I have always truly believed that you did not destroy animals and this was the determining factor in my selection of you as the beneficiary of my entire estate as I have no relatives and do not want the State of California, courts, or attorneys to benefit from my hard earned labor.

"I should appreciate greatly if you would clarify this point about the destruction of animals at your shelter and tell me honestly and truly what your policy is [and] not hedge because I have mentioned leaving my estate to your organization."

On September 9, 1987, NSAL wrote to assure her that it would not destroy any pet. NSAL included a brochure regarding estate planning. The brochure explained that a letter or a verbal promise will not effectuate a testamentary gift; that a proper written will is required. The mailing urged members to consult an estate planning attorney to avoid the possibility that the estate might end up with "distant relatives whom you didn't even know." Decedent never prepared a formal will.

NSAL sent a donor card to the decedent. It stated: "Your newest gift to the North Shore Animal League will help get more homeless dogs and cats out of cages and into new homes." The donor card thanked her "for your interest in making a bequest to the League." It explained that she could change her life insurance policy or provide for animals in her will by calling her attorney. It sought gifts and legacies and asked her to complete and return the donor card.

On April 19, 1989, she returned the donor card to NSAL. The card provided three options: a. naming NSAL as a beneficiary of a life insurance policy, b. changing one's will to leave securities or cash to NSAL, or c. not taking immediate action, but stating her intentions. (A copy of the donor card is attached as an appendix to this opinion.)

On the card, the decedent circled printed option c. which states: "I am not taking action now, but my intention is [in the blank space provided she wrote] My entire estate is to be left to North Shore Animal League."

The donor card also included a printed statement which reads, "The total amount that the animal shelter will someday receive is [she wrote in the blank space] $500,000." The card then stated, "I would like the money used for:

"Food and shelter for the animals

"Adoption Fund to advertise for new owners

"Spaying and Neutering Program

"Unrestricted use[.]"

Decedent placed an "x" next to the food and spaying options listed. She signed and dated the donor card.

On May 10, 1989, NSAL sent a thank you letter to decedent for "letting us know that you will remember the North Shore Animal League in your will." The letter requested that decedent "have your attorney send us a copy of your will[.]"

The Neptune Society asked for additional information to complete the death certificate, pursuant to amendments to the Probate Code. Decedent returned Neptune's supplemental form and stated that there are "[n]o living relatives" and to "[p]lease notify North Shore Animal League." She included NSAL's address, telephone numbers and the name of the executive director of NSAL. She signed the supplemental form and dated it October 20, 1989.

On September 2, 1992, NSAL sent a letter to decedent acknowledging that in March 1989 she wrote NSAL to state that she intended to take action leading to its becoming one of the beneficiaries of her estate. NSAL requested a meeting with decedent, thanking her for her "kind thoughts and generous support." She never responded to this request.

On January 14, 1994, Dorothy Southworth died. The Ventura County Public Administrator was appointed special administrator of her estate. The public administrator filed notice of its petition to administer her estate. NSAL filed its objection to the petition on the grounds that the donor card constitutes a holographic will of the decedent. Francis V. See contested the admission of the alleged holographic will on behalf of Jeanette and Jack Southworth, Michael and Arthur Hulse and himself.

Jeanette Southworth, Jack Southworth, Michael Hulse and Arthur Hulse assigned part of their alleged interests in the estate to See. Jeanette and Jack are the surviving half siblings of decedent. Michael and Arthur Hulse are the children of another half sister of decedent who predeceased her.[1]

The See contestants argued that the donor card should be denied admission into probate as a holographic will because not all of its material provisions are in the handwriting of the decedent and there is no showing of testamentary intent at the time she signed the card. NSAL argued that the donor card reflected decedent's testamentary intent and satisfied the statutory requirements for a holographic will.

The trial court concluded that decedent's handwritten statement on the donor card that "[m]y entire estate is to be left to North Shore Animal

---

[1]Michael and Arthur Hulse are not parties to this appeal.

League" substantially complies with all the Probate Code requirements for a holographic will. The court viewed the preprinted parts of the donor card and the $500,000 sum written in to be immaterial. The court interpreted the preprinted words stating that "I am not taking action now, but my intention is . . ." to mean that she did not want to immediately transfer her funds to NSAL, but intended to bequeath them upon her death. The trial court admitted the donor card to probate as the last will of the decedent. Jeanette and Jack Southworth, and Francis V. See, appeal from the judgment.

### DISCUSSION

The facts are stipulated. ■ "Where, as here, there is no conflict in the evidence, '"the validity of the holographic instrument must be determined entirely by reference to the applicable statutes and principles of law." [Citations.]' [Citation.]" (*Estate of Black* (1982) 30 Cal.3d 880, 883 [181 Cal.Rptr. 222, 641 P.2d 754].) Interpretation of statutes is a question of law and our fundamental task is to ascertain the intent of the Legislature. (*Walnut Creek Manor* v. *Fair Employment and Housing Com.* (1991) 54 Cal.3d 245, 268 [284 Cal.Rptr. 718, 814 P.2d 704].)

Former Civil Code section 1277 stated that "[a] [h]olographic will is one that is entirely written, dated and signed by the hand of the testator himself. *It is subject to no other form,* . . . and need not be witnessed." (Italics added.) Section 1277 was strictly construed. (See *Estate of Thorn* (1920) 183 Cal. 512 [192 P. 19] [despite obvious testamentary intent, document denied probate because rubber stamp was used to print name of parcel of real property within body of otherwise holographic will].)

In *Estate of De Caccia* (1928) 205 Cal. 719 [273 P. 552, 61 A.L.R. 393], our Supreme Court reversed the order of a trial court which had denied probate to an otherwise handwritten will simply because it was written under a printed letterhead stating, "Oakland, California."

In 1931, the Legislature reenacted former Civil Code section 1277 as section 53 of the Probate Code and added a third sentence to codify the rule announced in the *De Caccia* case. (See *Estate of Towle* (1939) 14 Cal.2d 261, 269 [93 P.2d 555, 124 A.L.R. 624].) The sentence stated, "No address, date or other matter written, printed or stamped upon the document, which is not incorporated in the provisions which are in the handwriting of the decedent, shall be considered as any part of the will."

In *Estate of Black, supra,* 30 Cal.3d at pages 882-883, the decedent wrote out her will on three identical, commercially printed one-page will forms. In

the blanks provided, she wrote her signature and place of domicile, and on the third page she inserted the name and gender of her executor, the date of the instrument and the city and state where she executed it. She either struck out or ignored other printed language regarding residuary gifts, the appointment of an executor, attesting witnesses and a testimonium clause.

"Using virtually all of the remaining space on each of the three pages, testatrix expressed in her own handwriting a detailed testamentary disposition of her estate, including specific devises and legacies to individuals and a charitable institution and a bequest of her residuary estate." (*Estate of Black, supra,* 30 Cal.3d at p. 883.)

The trial court denied probate because the testator incorporated some of the printed language, even though it concerned perfunctory procedural matters in the form will. Our Supreme Court reversed because "none of the incorporated material is either material to the substance of the will or essential to its validity as a testamentary disposition . . . ." (*Estate of Black, supra,* 30 Cal.3d at p. 882.)

The *Black* court explained that " '[t]he policy of the law is toward "a construction favoring validity, in determining whether a will has been executed in conformity with statutory requirements" [citations].' " (*Estate of Black, supra,* 30 Cal.3d at p. 883.) Moreover, we affirmed (*Estate of Baker* (1963) 59 Cal.2d 680, 685 [31 Cal.Rptr. 33, 381 P.2d 913]) " ' "the tendency of both the courts and the Legislature . . . toward greater liberality in accepting a writing as an holographic will . . . ." ' (*Ibid.*) ' "Substantial compliance with the statute, and not absolute precision is all that is required. . . ." ' [Citation.]" (*Black, supra,* at p. 883, italics in text.) Courts are to use common sense in evaluating whether a document constitutes a holographic will. (*Id.,* at pp. 885-886.)

The *Black* court recognized that " '[i]f testators are to be encouraged by a statute like ours to draw their own wills, the courts should not adopt, upon purely technical reasoning, a construction which would result in invalidating such wills in half the cases.' That sensible admonition is no less appropriate today. [Citations.]" (*Estate of Black, supra,* 30 Cal.3d at p. 884.) The law recognizes that such wills are generally made by people without legal training. (*Ibid.*) The primary purpose of the statutory holographic will provisions is to prevent fraud. Because counterfeiting another's handwriting " 'is exceedingly difficult,' " these statutes require the material provisions of holographic wills to be in the testator's handwriting. (*Ibid.*)

It was apparent to the *Black* court that the testator mistakenly believed she needed to use the printed language on the commercially printed will form

regarding procedural matters. Our Supreme Court noted that "identification of the document as a will and herself as its maker . . . are accomplished in the clearly expressed words of the document written by her own hand." (*Estate of Black, supra*, 30 Cal.3d at p. 885.)

The court determined that the printed clause of the commercial will form referring to a personal representative was "patently irrelevant" to the substance—the dispositive provisions of her will. (*Estate of Black, supra*, 30 Cal.3d at p. 885.) The court explained that the issue is not whether one mechanically intends to include printed material, but whether one intends to include printed material " '*because of its importance or materiality to the testamentary message.*' " (*Id.*, at pp. 885-886, italics added.) The inclusion of such printed procedural details does not invalidate an otherwise valid will. (*Id.*, at pp. 886-887.)

██  Whether a document should be admitted to probate as a holographic will depends on proof of its authorship and authenticity, and whether the words establish that it was intended to be the author's last will and testament at the time she wrote it. (*Estate of Black, supra*, 30 Cal.3d at p. 888.)

Our high court explained that four questions are pertinent in evaluating whether a document should be invalidated as a holographic will due to printed language in the document: "Was the particular provision relevant to the substance of the will? Was it essential to the will's validity? Did the testator intend to incorporate the provision? Would invalidation of the holograph defeat the testator's intent?" (*Estate of Black, supra*, 30 Cal.3d at p. 885.)

Accordingly, in 1983, the year after our Supreme Court decided *Black*, our Legislature replaced Probate Code section 53 with Probate Code section 6111. Section 6111 provides, in pertinent part, that "(a) A will . . . is valid as a holographic will, whether or not witnessed, if the signature and the material provisions are in the handwriting of the testator." In 1990, the Legislature added subdivision (c) which provides that "Any statement of testamentary intent contained in a holographic will may be set forth either in the testator's own handwriting or as part of a commercially printed form will."

Probate Code section 6111.5 states that "[e]xtrinsic evidence is admissible to determine whether a document constitutes a will pursuant to Section 6110 [concerning formal wills] or 6111, or to determine the meaning of a will or a portion of a will if the meaning is unclear."

██  There is no question that the handwriting on the document at issue is that of Dorothy Southworth, and that she signed and dated it. Unlike *Black*,

however, the document is not a commercially printed will form. It is a donor card for a charity. It was not drafted to serve as a will. The card provides the option of informing NSAL that the donor has or intends to instruct one's attorney to change his or her will.

Furthermore, the printed language Southworth incorporated from the donor card does not evince her present testamentary intent. Instead of striking the material printed words which state "I am not taking action now, but my intention is," she chose to incorporate those words with her handwritten statement, "My entire estate is to be left to North Shore Animal League." The material printed language together with her handwriting evince a future intent; not present testamentary intent.

Although other extrinsic evidence, such as her letter to NSAL of September 4, 1987, and the supplemental Neptune form she signed on October 20, 1989, shows that Southworth desired to leave her estate to NSAL, neither the donor card at issue nor the handwriting on it substantially complies with Probate Code requirements for holographic wills. Although courts may consider statements made before and after a holographic will is made and the surrounding circumstances, *evidence of present testamentary intent provided by the instrument at issue is paramount.* (*Estate of Wong* (1995) 40 Cal.App.4th 1198, 1204-1205 [47 Cal.Rptr.2d 707]; *Estate of Archer* (1987) 193 Cal.App.3d 238, 244 [239 Cal.Rptr. 137]; *Estate of French* (1964) 225 Cal.App.2d 9, 15-16 [36 Cal.Rptr. 908]; Prob. Code, §§ 6111, subd. (c), 6111.5.)

Here, Southworth incorporated printed language stating that she was not taking any action when she executed it. It does not establish her testamentary intent at the time she executed it. It only states her intention to make a will in the future.

The judgment is reversed. The parties are to bear their own costs.

Stone (S. J.), P. J., and Yegan, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 26, 1997. Kennard, J., was of the opinion that the petition should be granted.

APPENDIX

FOR ME...HALF FOR YOU          81:9E09

03/09/.          **153**

~~YOUR HALF~~

*MISS*
▮. D R SOUTHWORTH
6634 TAMARIND
ACOURA HILLS, CA 91301

Dear Mrs. Lewyt:

I know it takes a lot of money to
care for many thousands of homeless
dogs and cats each year, and because
you don't destroy animals, I have
decided:

a. I AM NAMING THE SHELTER AS A
   BENEFICIARY OF A LIFE INSURANCE
   POLICY.

   ( ) My insurance broker has
       already been notified.
   ( ) My broker will be notified
       by . . . . . . . . . . (date)

b. I AM CHANGING MY WILL TO LEAVE
   THE SHELTER . . . . . . . . . . .
          (stocks/bonds/cash/etc.)

   ( ) My attorney has already been
       instructed to change my will.
   ( ) My attorney will be instructed
       by . . . . . . . . . . (date)

(c) I AM NOT TAKING ACTION NOW, BUT
    MY INTENTION IS ▮▮▮▮▮.

   *My entire estate .
   is to be left to North .
   Shore Animal League*

   The total amount that the animal
   shelter will someday receive is
   $500,000.00 and I would like the
   money used for:

   (X) Food and shelter for the animals
   ( ) Adoption fund to advertise for
       new owners
   (X) Spaying and Neutering Program
   ( ) Unrestricted use

                     Sincerely,
   *Dorothy Southworth*

STREET · PORT WASHINGTON, N.Y. 11050  4/19/89

HALF OF THIS LETTER IS FOR ME ... AND HALF FOR YOU

**MY HALF**

**YOUR HALF**

Ms. D. R. Southworth
6634 Tamarind
Agoura, CA  91301

Ms. D. R. Southworth
6634 Tamarind
Agoura, CA  91301

Dear Ms. Southworth:

You are very kind.  Your newest gift to the
North Shore Animal League will help get
more homeless dogs and cats out of cages
and into new homes.

And thank you, especially, for your interest
in making a bequest to the League.  It is
easy to do:

\*\*\* You can change your life insurance
policy or take out a new one, naming
as beneficiary the North Shore Animal
League, Inc.  Just call your broker,
and he can take care of it for you.

\*\*\* You can provide for the animals in
your will by leaving cash, stocks,
bonds, real estate, or personal
property.  All you do is call your
attorney and tell him your wishes.
It is simple to amend your will or
make a new one.

Whether you give $10 or $10,000, it will be
most welcome and helpful.  Needless to say,
all gifts and legacies are tax deductible.

Thank you again for your support.  Now will
you use your half of this letter to reply?

Sincerely,

Alexander M. Lewyt, for
North Shore Animal League

AL1019

*(FOLD BACK AND TEAR OFF HERE)*

Dear Mr. Lewyt:

I know it takes a lot of money to care for
many thousands of homeless dogs and cats
each year, and because you don't destroy
animals, I have decided:

a. I AM NAMING THE SHELTER AS A BENE-
FICIARY OF A LIFE INSURANCE POLICY.

( ) My insurance broker has already
been notified.
( ) My broker will be notified by
_____(date)

b. I AM CHANGING MY WILL TO LEAVE THE
SHELTER_____
(stocks, bonds, cash, etc.)

( ) My attorney has already been
instructed to change my will.

( ) My attorney will be instructed
by_____(date)

c. I AM NOT TAKING ACTION NOW, BUT MY
INTENTION IS_____

_____

_____

_____

The total amount that the animal shelter
will some day receive is $_____,
and I would like the money used for:

( ) Food and shelter for the animals
( ) Adoption Fund to advertise for
new owners
( ) Spaying and Neutering Program
( ) Unrestricted use

Sincerely,

_____